

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71844-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| HARUN MOHAMED OSMAN, | ) | |
| | ) | |
| Appellant. | ) | FILED: January 25, 2016 |

SCHINDLER, J. — Harun Mohamed Osman seeks reversal of the assault in the fourth degree jury conviction. Osman contends that during closing argument, the prosecutor improperly shifted the burden of proof, and the court erred in sustaining the State's objection and impermissibly limited the scope of the defense closing argument. We hold the prosecutor properly argued reasonable inferences from the evidence and did not improperly shift the burden of proof to the defense. We conclude the court erred in sustaining the objection to the description of the meaning of "abiding belief" as inaccurate and limited the scope of the defense argument. However, because the error was harmless beyond a reasonable doubt, we conclude the jury verdict would have been the same absent the error, and affirm.

FACTS

After returning from work on November 29, 2012, Tammy Maxwell asked her son Nicholas to drop her off at the Castaway Tavern while he went to the library. Maxwell sat at the bar and had a couple of drinks. Harun Mohamed Osman approached Maxwell and offered to buy her another drink. Shortly thereafter, Nicholas sent Maxwell a text message that he was outside in the parking lot.

Maxwell got up, put down her drink, and left. Osman followed Maxwell outside and asked her to sit in his car and talk. In an effort to get him to leave her alone, Maxwell said she agreed to sit in his car and talk. Maxwell told Nicholas to wait and "she would be right back."

A few minutes later, Osman drove out of the Castaway Tavern parking lot at a high speed. Nicholas called Maxwell on her cell phone. Before the phone disconnected, Maxwell yelled Nicholas should follow the car. Nicholas tried calling back a number of times. At one point, the call connected and he heard Maxwell demanding Osman give her cell phone back.

At approximately 11:00 p.m., Federal Way Police Department Officer Chris Martin, Officer Gabriel Castro, and Officer Robert Guillermo detained suspects in a stolen vehicle. When Officer Martin heard someone screaming for help from across the intersection, he ran in the direction of the screams.

As Officer Martin ran into a parking lot behind an espresso stand and a McDonald's, he saw a car "parked nose in." A female, later identified as Tammy Maxwell, was sitting in the driver's seat of the vehicle with her legs hanging out. A man, later identified as Harun Mohamed Osman, was "standing over her punching her" in the

2

face with a closed fist. Officer Martin ordered Osman to stop hitting Maxwell. When Osman "came out" of the car, he had a torn white bra strap in his hand. Officer Martin said Maxwell was "afraid, crying, [and] upset." Officer Martin saw marks on her face, and Maxwell had broken several acrylic fingernails. Officer Martin detained Osman until Officer Castro and Officer Guillermo arrived. Officer Castro took photographs of Maxwell's facial injuries and her torn clothing. Maxwell gave the police a written statement under penalty of perjury. The next morning, Maxwell realized she lost a hoop earring during the "struggle" with Osman.

On December 4, Detective Raymond Unsworth executed a warrant to search Osman's car. Detective Unsworth found a wallet between the driver's seat and the center console. Detective Unsworth later found a hoop earring on the floorboard of the driver's side of the car.

The State charged Osman with unlawful imprisonment, felony harassment, and assault in the fourth degree. Osman entered a plea of not guilty.

A number of witnesses testified during trial including Maxwell, her son Nicholas, Officer Martin, Officer Castro, Officer Guillermo, and Detective Unsworth. The court admitted into evidence a number of photographs. The defense did not call any witnesses. The defense theory was that Maxwell willingly got into the car, Osman did not threaten to kill Maxwell, and because it was a mutual struggle, Osman did not commit assault.

Maxwell testified that she worked as an in-home caregiver for persons with disabilities and the elderly. Maxwell said that on November 29, 2012, she was very affected by a terminally ill client she worked with at the end of the day. When Maxwell

3

got home, she asked Nicholas to drop her off at the Castaway Tavern while he was at the library. Maxwell said she sat at the bar and had a few drinks. Maxwell testified that Osman approached her and tried "to strike up a conversation" and buy her a drink. Maxwell testified Osman was insistent and she was "annoyed."

> You know, he kept saying, you know, I'd like to talk to you, I want to talk to you, I'd like to get to know you, I want to talk to you. . . .
>
> . . . .
>
> . . . He wasn't taking no for an answer. I finished my drink and he offered to buy me another drink and I told him that I can get my own drink and he was like no, let me get it. And I was like no I can get it myself. And he just basically told the bartender, no, I've got her drink. And the bartender made the drink for me and sat it down and . . . so then I just went ahead and I was like fine, I'll just drink the drink figuring that maybe that'll let it be.
> It didn't. It continued. He continued talking.

After Nicholas sent a text that he was in the parking lot, Maxwell left. Maxwell said Osman followed "right behind." She said Osman opened the door to his car and "kept asking me to sit and talk with him, would I sit and talk with him." Maxwell testified she agreed to sit in the car. "Really to be honest because he was bothering me and it was like if this just would be just done. . . . [I]t was very persistent. It wasn't to where I could say, could you just leave me alone."

According to Maxwell, after Osman "shut the door," she "wanted to get back out of the car" but "couldn't figure out how to open the door because the door was locked." Maxwell testified that Osman said, "[J]ust sit and talk for a minute, just sit and talk," but then he started the car and said, "I'm just going to take you to your son it's raining." Maxwell testified that she said, "[N]o, it's just right there I can walk. I don't want you to start the car. I don't want you to take me over there."

Maxwell said Osman "put the car in reverse and just tore out of the parking lot." Maxwell testified she was "yelling on the phone, Nick, follow us, Nick, follow us," and Osman said, "[I]f your son follows us I'll kill him too." Maxwell testified she fought the whole time and was doing everything she could to get out of the car, but Osman was "trying to keep me in my seat."

> He kept grabbing me around this side, on the waist, on the breast area, trying to hang on to me.
>  . . . .
>  . . . I was trying to get out, like I was trying to open the door to jump out of the car. And he was trying to keep me in my seat.

Maxwell testified Osman "turned in to this dark area by McDonalds" and when he stopped the car, she got out. Maxwell said that as she "started to run towards the McDonalds," Osman came "around the front of the car onto my side and he was trying to stop me. And get me back in the car." Maxwell testified that after Osman grabbed her cell phone and walked to the driver's side of the car, she reached around Osman as he "leaned into the driver's side" of the car to "grab[ ] my phone back and struggled with him."

Maxwell said that just before the police officers arrived, Osman "punched me in the side of the face" and "got me pretty good." Maxwell testified, in pertinent part:

> I was seriously shaken. I — he had hit me here in the face so that was sore and red. He tore my clothes, like on the side here. And my bra was broken. The bra clasp had cut into me so I was bleeding. I was very shaken. Very, very shaken.
>  . . . [M]y hands hurt because I had fought so — like broke several of — I had acrylic nails, I had broke several nails in the argue — in the fight. I lost an earring.

On cross-examination, Maxwell testified that while at the Castaway Tavern, "I was on my third drink" and "feeling tipsy." Maxwell said what happened is "kind of

5

fuzzy" and she did not know how she "ended up in his car." Maxwell admitted that according to her written statement, she "got into his car so we [could] talk." Maxwell also admitted she gave Osman her cell number and she did not tell the police that Osman threatened to kill her. In the written statement, Maxwell said Osman told her, "I don't want to beat you down but I will."

Nicholas testified that Maxwell told him she was going to talk to Osman in his car "for about a minute." Nicholas said that after about five minutes, the car "pulled out in a hurry." When Nicholas called Maxwell on her cell phone, he heard them arguing about whether she had taken Osman's wallet.

> I heard talk about money and something about him accusing her of taking money and her saying, I don't have your money, I don't have your money. And then he was like, he said something else about, yeah you do and where's my money?

Nicholas testified that when he called back, he heard his "mom saying stop the car, stop the car. And she was like, let me out. And then all I heard was Nick, come get me, help, Nick, come get me. Then I heard [Osman] say, if he comes I'll kill him too." After the phone disconnected, Nicholas tried to call back a number of times. When he "tried one more time," he "got an answer, and then it sounded like she was on speaker and all I heard her saying was give me my phone."

On cross-examination, Nicholas testified Maxwell and Osman left the tavern together, and Maxwell "appeared normal," not "scared" or "angry," and was "[i]n fact, . . . smiling." Nicolas testified Maxwell and Osman walked "[s]ide to side" to Osman's car and she "hopped" into the passenger seat.

Officer Martin testified that he heard someone from across the intersection scream for help, and as he ran into the espresso stand parking lot next to the McDonald's, he saw Osman punch Maxwell in the face three times "with a closed fist."

Officer Castro testified he heard a female screaming from across the intersection and ran in the same direction as Officer Martin. Officer Castro said that when he arrived, Officer Martin had detained Osman and Maxwell was crying, "her shirt was pulled out[,] and there was a bra strap on the outside of the shirt."

Officer Castro said he could smell the odor of alcohol on Osman and Osman appeared intoxicated. Osman told Officer Castro that while they were in the Castaway Tavern parking lot, Maxwell "took the keys and got into his car. She was hungry so they went down to McDonalds" and as they were driving, "he noticed his wallet was missing" and believed Maxwell took the wallet.

> [Osman] said that he was at Castaway with Ms. Maxwell. While in the parking lot she took the keys and got into his car. She was hungry so they went down to McDonalds and when they got — while they were driving down there he noticed his wallet was missing and so when they got parked he got out of the car and w[ent] to go get his wallet back from her. And that's when the police arrived when he was trying to pull her out of the car.

Officer Guillermo testified that while he was assisting Officer Martin and Officer Castro detain the occupants of a stolen car, he "could hear a female screaming from across the street." Officer Guillermo said he arrived in his patrol car right after Officer Martin and Officer Castro detained Osman. Officer Guillermo said Osman was arguing with the officers and appeared intoxicated. "I could smell a strong odor of an alcoholic beverage . . . . His eyes were also red, bloodshot, and glassy."

7

Officer Guillermo frisked Osman and found an Apple iPhone and a "blue lanyard around his neck with a car key on it." During the frisk, Osman told Officer Guillermo, "[S]he mixed my drink, she has my wallet and my car keys[ and] I just got paid $400." Officer Guillermo said he told Osman the car key was on a lanyard that was "around his neck." Officer Guillermo testified Osman also said that "the wallet was left at the bar — he lost it at the bar."

Detective Unsworth testified that when he executed the warrant to search Osman's car on December 4, he found Osman's wallet between the driver's seat and the center console. Detective Unsworth took photographs before removing the wallet from the car. Detective Unsworth testified that a hoop earring was later found on the "driver's side floorboard." The hoop earring found in the vehicle matched Maxwell's missing earring. On December 12, Detective Unsworth took photographs of Maxwell's broken acrylic fingernails, the hoop earring found in the car, and the earring Maxwell still had in her possession. The court admitted the photographs of the wallet, Maxwell's broken acrylic fingernails, and the hoop earrings.

During closing argument, the State argued the evidence showed "this was not a consensual encounter." The State pointed to two "very very important pieces of evidence" to argue Osman was guilty of unlawful imprisonment and assault.

> First of all [Maxwell's] testimony. Throughout the whole incident nothing was consensual. She agreed to nothing and it ended awful. Screaming out of the parking lot, evidence that this was not a consensual encounter on her part and [Osman's] part in any way. He got out of there quick.
> It continued even after the car stopped. He got out, ran around, restricted her movement, took her cell phone so she couldn't leave because she needed that cell phone back.

Two very very important pieces of evidence to remember in this case. [Inaudible] number one, her earrings with the big loop that went down [inaudible] and the fingernail pictures taken two weeks later.

The defense argued the evidence showed Maxwell willingly got into the car with Osman and he did not threaten to kill her. Defense counsel argued Osman was angry because his wallet was missing and he believed "she took it." Defense counsel admitted Osman was "wrong about the wallet. But he's also right. The wallet was not in his pants pocket." Defense counsel emphasized the language in the jury instruction that states an act "is not an assault if it is done with the consent of the person alleged to be assaulted" to argue, "If there's a mutual fight or a mutual struggle going on that's not a crime." Defense counsel said Osman just wanted his wallet back.

The conversation that [Osman] is having in the vehicle, what is his goal? Is it does he actually want to hurt Tammy or does he want his wallet back?
Nick apparently is on the phone because that's what Nick said.

At the end of the defense closing argument, the attorney addressed the meaning of "an abiding belief of the truth of the charge." The prosecutor objected to the defense argument—"Your Honor, I'm going to object that's not . . . accurate." The court sustained the objection.

The jury found Osman not guilty of unlawful imprisonment and felony harassment. The jury found Osman guilty of assault in the fourth degree. The court imposed a 364-day suspended sentence with 12 months probation and a no-contact order. Osman appeals the conviction.

ANALYSIS

Shifting the Burden of Proof

Osman contends prosecutorial misconduct during closing argument requires reversal. Osman claims the prosecutor committed misconduct by improperly shifting the burden of proof by questioning how the hoop earring was found in the car if a struggle did not occur.

To prevail on a claim of prosecutorial misconduct, a defendant must show the prosecutor's argument was improper and prejudicial. State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). An abuse of discretion standard applies to allegations of prosecutorial misconduct. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). We review allegedly improper statements in the context of the entire argument, the issues in the case, the evidence, and the jury instructions. State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006).

A criminal defendant has no duty to present evidence, and it is error for the prosecutor to suggest otherwise. State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). An argument that shifts the State's burden to prove guilt beyond a reasonable doubt constitutes misconduct. State v. Thorgerson, 172 Wn.2d 438, 453, 258 P.3d 43 (2011); State v. Gregory, 158 Wn.2d 759, 859-61, 147 P.3d 1201 (2006).

However, a prosecutor is entitled to point out the improbability or lack of evidentiary support for the defense theory of the case. State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). A prosecutor has wide latitude to comment on the evidence introduced at trial and to draw reasonable inferences from the evidence. Thorgerson, 172 Wn.2d at 448. The "mere mention that defense evidence is lacking does not

10

constitute prosecutorial misconduct or shift the burden of proof to the defense." State v. Jackson, 150 Wn. App. 877, 885-86, 209 P.3d 553 (2009).

Here, the prosecutor argued the evidence showed Osman was guilty of unlawful imprisonment and assault. The prosecutor pointed to two "very important pieces of evidence"—Maxwell's broken acrylic fingernails and her lost earring—to show Osman used physical force to restrain and assault Maxwell during the struggle in the car.

> Two very very important pieces of evidence to remember in this case. . . . [N]umber one, her earrings with the big loop that went down . . . and the fingernail pictures taken two weeks later.

The prosecutor then asked:

> If a struggle or some type of confrontation didn't occur in the car how did that earring come out of her ear and get left on the floor and how did she break those fingernails if an encounter did not, and a struggle, did not occur?

The defense objected, "Misstates burden." The court overruled the objection.

The prosecutor's argument did not impermissibly shift the burden of proof to the defense. The argument was based on the evidence. The prosecutor did not argue that the defense had failed to offer another reasonable explanation. Rather, the prosecutor argued that the evidence did not support any other reasonable explanation. Because the argument properly focused on the evidence, Osman cannot show prosecutorial misconduct.[1]

## Abiding Belief

Osman contends the court erred in sustaining the State's objection to defense counsel's description of the meaning of "abiding belief" as "not . . . accurate" and impermissibly limited the scope of closing argument.

---

[1] Therefore, we need not address prejudice.

The trial court has broad discretion over the scope of closing argument. State v. Perez-Cervantes, 141 Wn.2d 468, 474-75, 6 P.3d 1160 (2000); Herring v. New York, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975).

> "The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. . . . He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion."

Perez-Cervantes, 141 Wn.2d at 474-75[2] (quoting Herring, 422 U.S. at 862). The Washington Supreme Court emphasized the trial court should restrict the argument of counsel to the facts in evidence and the law as set forth in the instructions to the jury. State v. Frost, 160 Wn.2d 765, 772, 161 P.3d 361 (2007).

Where a trial court improperly limits the scope of closing argument, the constitutional rights of the defendant may be implicated. Frost, 160 Wn.2d at 772-73. The Sixth Amendment right to counsel includes the right to make closing argument on behalf of the defense. Herring, 422 U.S. at 858; Frost, 160 Wn.2d at 772-73; U.S. CONST. amend. VI. In Herring, the Supreme Court notes closing argument is the defendant's "last clear chance to persuade the trier of fact that there may be reasonable doubt." Herring, 422 U.S. at 862; see also Perez-Cervantes, 141 Wn.2d at 474.

An improper limitation of closing argument may also infringe on the defendant's right to due process. In In re Winship, 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), the Supreme Court held due process requires the State to prove the elements of the charged crime beyond a reasonable doubt. Proof beyond a reasonable doubt is a fundamental right protected by the due process clause—"that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the

---

[2] Alteration in original.

administration of our criminal law.' " Winship, 397 U.S. at 363 (quoting Coffin v. United States, 156 U.S. 432, 453, 15 S. Ct. 394, 39 L. Ed. 481 (1895)). In Winship, the Court states, "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." Winship, 397 U.S. at 364.

Accordingly, jury instructions must accurately convey the State bears the burden of proving every essential element of the charged crime beyond a reasonable doubt. Victor v. Nebraska, 511 U.S. 1, 5-6, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994). However, the Constitution does not require "any particular form of words be used in advising the jury of the government's burden of proof." Victor, 511 U.S. at 5.

> The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. . . . Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. . . . Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." Holland v. United States, 348 U.S. 121, 140, 75 S. Ct. 127, 137, 99 L. Ed. 150 (1954).

Victor, 511 U.S. at 5.[3]

In Victor, the Court considered the language of a reasonable doubt jury instruction used in California. The jury instruction defined "reasonable doubt" as "not a mere possible doubt" and after consideration of all the evidence, "leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." Victor, 511 U.S. at 5.

> A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt

---

[3] Some alterations in original.

13

> is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt.
>
> Reasonable doubt is defined as follows: It is <u>not a mere possible doubt</u>; because everything relating to human affairs, and <u>depending on moral evidence</u>, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, <u>to a moral certainty</u>, of the truth of the charge.

<u>Victor</u>, 511 U.S. at 5.[4]

The defendant argued that use of the phrase "to a moral certainty" lowered the burden of proof beyond a reasonable doubt and violated due process. <u>Victor</u>, 511 U.S. at 6. The Court concluded that although "a jury might understand the phrase to mean something less than the very high level of probability required by the Constitution in criminal cases," the "abiding conviction" language cured the defect. <u>Victor</u>, 511 U.S. at 14.

> Although in this respect moral certainty is ambiguous in the abstract, the rest of the instruction given . . . lends content to the phrase. The jurors were told that they must have "an abiding conviction, to a moral certainty, of the truth of the charge." . . . <u>An instruction cast in terms of an abiding conviction as to guilt . . . correctly states the government's burden of proof.</u> . . . As used in this instruction, therefore, we are satisfied that the reference to moral certainty, in conjunction with the abiding conviction language, "impress[ed] upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused." . . . Accordingly, we reject [the] contention that the moral certainty element of the California instruction invited the jury to convict him on proof below that required by the Due Process Clause.

<u>Victor</u>, 511 U.S. at 14-15[5] (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

---

[4] Emphasis in original, internal quotation marks omitted.

[5] Emphasis added.

Nonetheless, the Court notes that it did not condone use of the phrase "a moral certainty," but because the Court had "no supervisory power over the state courts, . . . in the context of the instructions as a whole we cannot say that the use of the phrase ['moral certainty'] rendered the instruction given . . . unconstitutional." Victor, 511 U.S. at 16-17, 21.

Like the Supreme Court in Victor, in State v. Bennett, 161 Wn.2d 303, 317, 165 P.3d 1241 (2007), our Supreme Court was confronted with a "problematic" reasonable doubt instruction. The court concluded the instruction met the minimum requirements but exercised its supervisory power over the State courts.

> Like the Supreme Court in Victor, we are confronted with a reasonable doubt instruction which we find problematic. Unlike the United States Supreme Court, we do have supervisory powers over our State's courts. State v. Fields, 85 Wn.2d 126, 129, 530 P.2d 284 (1975) (citing State ex rel. Foster-Wyman Lumber Co. v. Superior Court, 148 Wash. 1, 267 P. 770 (1928)). Even if many variations of the definition of reasonable doubt meet minimal due process requirements, the presumption of innocence is simply too fundamental, too central to the core of the foundation of our justice system not to require adherence to a clear, simple, accepted, and uniform instruction.

Bennett, 161 Wn.2d at 317-18.[6]

The court in Bennett states that it previously approved use of the "abiding belief" language in a reasonable doubt instruction in State v. Pirtle, 127 Wn.2d 628, 656-58, 904 P.2d 245 (1995). Bennett, 161 Wn.2d at 317. "We have approved [11 Washington Practice: Washington Pattern Jury Instructions: Criminal 4.01, at 79 (2d ed. Supp. 2005) (WPIC)] and concluded that it adequately permits both the government and the

---

[6] See also Commonwealth v. Russell, 23 N.E.3d 867, 470 Mass. 464 (2015). In Russell, the Massachusetts Supreme Court agreed with the reasoning in Bennett and exercised its inherent supervisory authority to require a uniform instruction on proof beyond a reasonable doubt that states, in pertinent part, "A charge is proved beyond a reasonable doubt if, after you have compared and considered all of the evidence, you have in your minds an abiding conviction, to a moral certainty, that the charge is true." Russell, 23 N.E.3d at 876-78 (internal quotation marks omitted).

accused to argue their theories of the case." Bennett, 161 Wn.2d at 317 (citing Pirtle, 127 Wn.2d at 656-58). The Supreme Court instructed the trial courts to use WPIC 4.01 to instruct the jury on the State's burden to prove every element of the charged crime beyond a reasonable doubt. Bennett, 161 Wn.2d at 317-18. WPIC 4.01 states:

> The defendant has entered a plea of not guilty. That plea puts in issue every element of the crime charged. The [State] [City] [County] is the plaintiff and has the burden of proving each element of the crime beyond a reasonable doubt.
>
> A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.
>
> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.[7]

Here, the trial court used WPIC 4.01 and the abiding belief language to instruct the jury on the State's burden of proof and reasonable doubt. Jury instruction 3 states:

> The defendant has entered a plea of not guilty. That plea puts in issue every element of each crime charged. The State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements.

---

[7] WPIC 4.01, at 65 (2d ed. 1994) (emphasis added, alterations in original). The former WPIC (2d ed. 1994) included two separate instructions to define reasonable doubt, WPIC 4.01 and 4.01A. Former WPIC 4.01 "was the original pattern instruction" on proof beyond a reasonable doubt and former WPIC 4.01A was added in 1986 "to provide an alternative definition." WPIC 4.01 cmt. at 85 (3d ed. 2008).

> Both instructions defined reasonable doubt in terms of doubt that would exist in the mind of a reasonable person. The primary difference between the two instructions in previous editions was that WPIC 4.01 included an additional sentence on abiding belief, while WPIC 4.01A did not.

WPIC 4.01 cmt. at 85-86. In the 2008 edition, the WPIC comment states that former WPIC 4.01 and 4.01A are merged into a single jury instruction with the abiding belief language in brackets. WPIC 4.01 cmt. at 85-86. The comment also notes, "Washington's traditional abiding-belief instruction (WPIC 4.01 in the second edition's main volume) has been upheld in several appellate cases." WPIC 4.01 cmt. at 86.

A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.

A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.[8]

At the end of closing argument, defense counsel addressed the reasonable doubt jury instruction and the meaning of "an abiding belief in the truth of the charge." Defense counsel argued, "[I]f you find Harun guilty the minute you walk out of this courthouse that's your decision you can't change your mind . . . . A month from now . . . you can't go back and say maybe I made a mistake."

The doubts that you have about this case, about this story, create a duty for you to find Harun not guilty. . . .

But if you decided that there's enough evidence beyond a reasonable doubt to convict Harun jury instruction number [three] talks about what you have to do to get there. . . .

But what jury instruction number three the last sentence reads is that "if you have an abiding belief of the truth of the charge" what does that mean? It means that if you find Harun guilty the minute you walk out of this courthouse that's your decision you can't change your mind and look back and say I wonder if I made a mistake.

A month from now when maybe you're talking to people about your experience you can't go back and say maybe I made a mistake.

When the defense continued and said, "A year from now —," the prosecutor interrupted to object—"Your Honor, I'm going to object that's not . . . accurate." The court sustained the objection. The defense attorney then argued, "An abiding belief is the truth of the charge. Ask yourself, do you have a doubt? And do you have a reason for it? Thank you for listening."[9]

---

[8] Emphasis added.

[9] The State did not make a rebuttal argument.

17

Osman asserts the court erred in sustaining the State's objection to the defense description of "an abiding belief in the truth of the charge" as inaccurate. The State contends the defense argument is a misstatement of the law. Specifically, that the argument overstates and improperly quantifies the reasonable doubt standard.

Washington case law has not addressed the meaning of the phrase "abiding belief." The United States Supreme Court in Victor provides guidance. In Victor, the Court described the meaning of an "abiding conviction" as "settled" and "fixed." Victor, 511 U.S. at 15. " 'The word "abiding" here has the signification of settled and fixed, a conviction which may follow a careful examination and comparison of the whole evidence.' " Victor, 511 U.S. at 15 (quoting Hopt v. Utah, 120 U.S. 430, 439, 7 S. Ct. 614, 30 L. Ed. 708 (1887)).[10] Specifically, the Court held that the reference to an "abiding conviction" impressed on the jurors " 'the need to reach a subjective state of near certitude of the guilt of the accused.' " Victor, 511 U.S. at 14-15 (quoting Jackson, 443 U.S. at 315).

We hold the defense argument was not a misstatement of the law. "[A]n abiding belief in the truth of the charge" connotes both duration and the strength and certainty of a conviction. Defense counsel properly relied on the abiding belief language in the reasonable doubt instruction to emphasize the attorney was seeking to impress on the jurors the need " 'to reach a subjective state of near certitude of the guilt of the accused.' "[11] In arguing a juror should not "look back" on the decision "the minute [they] walk out of this courthouse" or "[a] month" or "[a] year" later and "wonder if I made a

---

[10] Consistent with the description of "abiding conviction" in Victor, Webster's Third New International Dictionary 3 (2002) defines "abiding" as "great or lasting" and "continuing or persisting in the same state without changing or diminishing."

[11] Victor, 511 U.S. at 14-15. (quoting Jackson, 443 U.S. at 315).

mistake," the defense argument did not overstate or improperly quantify the State's burden of proof.

The State relies on State v. Anderson, 153 Wn. App. 417, 220 P.3d 1273 (2009), and State v. Johnson, 158 Wn. App. 677, 243 P.3d 936 (2010), to argue the defense argument impermissibly quantifies the burden of proof. Anderson and Johnson are inapposite.

In Anderson, the prosecutor compared the certainty required to convict with everyday decisions such as deciding to have "elective surgery," "leaving . . . children with a babysitter," and "changing lanes on the freeway." Anderson, 153 Wn. App. at 424-25.[12] The court concluded the argument trivialized the State's burden of proof and was improper.

> By comparing the certainty required to convict with the certainty people often require when they make everyday decisions—both important decisions and relatively minor ones—the prosecutor trivialized and ultimately failed to convey the gravity of the State's burden and the jury's role in assessing its case against [the defendant].

Anderson, 153 Wn. App. at 431.

In Johnson, the prosecutor compared "an abiding belief" to a partially completed jigsaw puzzle, arguing that despite the missing pieces, it was still possible to conclude beyond a reasonable doubt what the puzzle represented. The prosecutor argued, in pertinent part:

> You add another piece of the puzzle, and suddenly you have a narrower view . . . .
> You add a third piece of the puzzle, and at this point even being able to see only half, you can be assured beyond a reasonable doubt that

---

[12] Internal quotation marks omitted.

this is going to be a picture of Tacoma.

Johnson, 158 Wn. App. at 682.[13] The prosecutor also argued, "To be able to find reason to doubt, you have to fill in the blank, that's your job." Johnson, 158 Wn. App. at 682.[14]

On appeal, the court reversed. Johnson, 158 Wn. App. at 686. The court held the fill-in-the-blank argument and puzzle analogy that required the jury to supply the missing pieces to justify reasonable doubt trivialized the burden of proof and was flagrant and ill-intentioned misconduct. Johnson, 158 Wn. App. at 685-86.

Likewise, in Lindsay, the prosecutor used a nearly identical puzzle analogy to describe the burden of proof beyond a reasonable doubt.

> And then you put in about 10 more pieces and see this picture of the Space Needle. Now, you can be halfway done with that puzzle and you know beyond a reasonable doubt that it's Seattle. You could have 50 percent of those puzzle pieces missing and you know it's Seattle.

Lindsay, 180 Wn.2d at 434.[15] The Supreme Court concluded that as in Johnson, "the quantification by the prosecutor of the number of pieces and percentage of completion required for reasonable doubt" was improper. Lindsay, 180 Wn.2d at 435-36.

Here, the defense attorney's description of the meaning of abiding belief did not trivialize the State's burden of proving the elements of the crime beyond a reasonable doubt. The argument does not impermissibly quantify or assign a percentage like the puzzle examples used in Johnson and Lindsay. Instead, the argument properly addressed the significance of having "an abiding belief in the truth of the charge" by arguing jurors should not "look back" the minute they walk out of the courtroom or a

---

[13] Internal quotation marks omitted.
[14] Internal quotation marks omitted.
[15] Internal quotation marks omitted.

20

month or year later and "say maybe I made a mistake." We hold the defense argument is not an improper characterization of the reasonable doubt standard. The court erred in sustaining the objection as inaccurate and limited the scope of the defense closing argument.

The State argues that even if the court abused its discretion in sustaining the objection and limited the scope of defense counsel's argument, the error was harmless.

The limitation of the scope of closing affects the " 'trial process itself' " and is subject to a constitutional harmless error analysis. Frost, 160 Wn.2d at 781-82 (quoting Arizona v. Fulminante, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)). In Glebe v. Frost, ___ U.S. ___, 135 S. Ct. 429, 430-31, 190 L. Ed. 2d 317 (2014),[16] the Supreme Court affirmed the Washington Supreme Court in Frost:

> Most constitutional mistakes call for reversal only if the government cannot demonstrate harmlessness. Neder v. United States, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). Only the rare type of error—in general, one that "infect[s] the entire trial process" and "necessarily render[s] [it] fundamentally unfair"—requires automatic reversal. [Id.] None of our cases clearly requires placing improper restriction of closing argument in this narrow category.

In determining whether the error was harmless, "we must 'conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.' " State v. Brown, 147 Wn.2d 330, 341, 58 P.3d 889 (2002) (quoting Neder, 527 U.S. at 19).

To convict Osman of assault in the fourth degree, the State had the burden of proving beyond a reasonable doubt that Osman intentionally assaulted Maxwell. RCW 9A.36.041. " 'Assault is an intentional touching or striking of another person that is harmful or offensive, regardless of whether it results in physical injury.' " State v. Jarvis,

---

[16] Emphasis in original, some alterations in original, internal quotation marks omitted.

160 Wn. App. 111, 119, 246 P.3d 1280 (2011) (quoting State v. Tyler, 138 Wn. App. 120, 130, 155 P.3d 1002 (2007)). "[T]he intent required for assault is merely the intent to make physical contact with the victim, not the intent that the contact be a malicious or criminal act." Jarvis, 160 Wn. App. at 119.

Maxwell testified Osman "punched me in the side of the face" and "connected solidly." Maxwell said Osman tried to punch her "two or three times" and "one time he got me pretty good."

Officer Martin testified that he saw Maxwell sitting in the driver's seat of the car and Osman standing over her, punching her in the face three times "with a closed fist." Officer Martin and Officer Castro "observed marks on her face." The photograph admitted into evidence shows red marks on the side of her face. Consistent with Officer Martin's testimony that Maxwell was in the driver's seat while Osman was punching her in the face, Maxwell's earring was found on the "driver's side floorboard."

Further, the court properly gave the WPIC 4.01 jury instruction on reasonable doubt and informed the jurors that the State had the burden of proving each element of the crime beyond a reasonable doubt. In addition, the court instructed the jury, in pertinent part:

> Each party has the right to object to questions asked by another lawyer, and may have a duty to do so. These objections should not influence you. Do not make any assumptions or draw any conclusions based on a lawyer's objections.

We presume the jury follows the instructions of the court. State v. Kalebaugh, 183 Wn.2d 578, 586, 355 P.3d 253 (2015).

We conclude beyond a reasonable doubt that the jury verdict on assault in the fourth degree would have been the same absent the error.

We affirm the conviction of assault in the fourth degree.

WE CONCUR: