# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

AHMED MOHAMED ELMESAI,

Appellant.

No. 83017-1-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — Ahmed Elmesai appeals his convictions for rape in the third degree and assault in the second degree. Elmesai argues that (1) the trial court erred in limiting defense counsel's closing argument, (2) the prosecutor committed misconduct, (3) the trial court erred in dismissing two jurors for cause, and (4) the trial court abused its discretion in failing to dismiss sua sponte two allegedly biased jurors. We affirm.

## FACTS

Elmesai and L.R. met through a mutual friend in 2019. The parties dispute the nature of their relationship. But they do not dispute that L.R. obtained methamphetamine from Elmesai many times and that they did drugs together.

On January 10, 2020, L.R. went to see Elmesai's new apartment in Seattle. Elmesai was not home when L.R. arrived but had left the door unlocked for her. Elmesai asked L.R. to do his dishes and not to go in his bedroom. When Elmesai returned home, they watched T.V. and drank some alcohol.

Later in the evening, a friend of Elmesai's stopped by, L.R. became uncomfortable and wanted to go home. Elmesai noticed that his bedroom door was open and believed his watch was missing. Elmesai then accused L.R. of stealing, yelled at her, grabbed her purse, and dumped the contents out. Elmesai's friend was told to leave. L.R. testified that Elmesai then hit her in the face with his wine glass, breaking the glass. Elmesai alleged at trial that he dumped the wine in his glass on L.R. and grabbed her purse. He testified that L.R. then lunged for her purse and her "face brushe[d] against the wine flute" and the glass immediately crumpled. In any case, a piece of glass lacerated L.R.'s cornea and she had abrasions on her cheek.

L.R. described feeling terrified. L.R. went into the bathroom and tried to rinse the glass out of her eye. She described the pain as excruciating and her vision was impaired. L.R. tried to calm Elmesai down because she was scared that he would kill her. L.R. alleged that Elmesai then raped her. L.R. testified that she never gave consent.

L.R. went to the hospital about 36 hours later, reported the sexual assault, and complained of eye pain. She was treated for a corneal laceration and underwent a sexual assault examination.

Soon after, Elmesai was arrested and charged with rape in the second degree. The charges were later amended to rape in the third degree and assault in the second degree.

Prospective jurors were sent questionnaires to respond to before voir dire.[1] During voir dire, the prosecutor and defense counsel had a chance to question prospective jurors. After questioning, the State moved to remove two prospective jurors for cause. The defense moved to dismiss four prospective jurors for cause. Jurors 3 and 4 were selected randomly as alternates. Neither party objected. The parties then alternated exercising peremptory challenges. The State used five of its six peremptory challenges and then accepted the panel. The defense used all six of its peremptory challenges.

The alternates, jurors 3 and 4, were dismissed before deliberations. The jury found Elmesai guilty of rape in the third degree and assault in the second degree. Elmesai was sentenced to 57 months confinement.

Elmesai appeals.

ANALYSIS

A. Closing Argument

Elmesai argues that the trial court placed two improper limits on defense counsel's closing argument. First, by instructing the jury to ignore evidence that L.R. cooperated with the prosecution in exchange for a promise to overlook her methamphetamine use. And second, by sustaining an objection to defense counsel's

---

[1] The answers to the questionnaire were sealed in the trial court and filed under seal with this court.

argument that drug use may have dulled L.R.'s pain. The State argues that neither ruling was improper but, regardless, any error was harmless. We agree that the first ruling was error but find that it was harmless and the second ruling was not error.

The Sixth Amendment right to counsel includes the right to make closing argument. State v. Osman, 192 Wn. App. 355, 368, 366 P. 3d 956 (2016); U.S. CONST. amend. VI. A defendant's due process rights may also be infringed when a trial court improperly limits the scope of counsel's closing argument. Osman, 192 Wn. App. at 369. But trial courts possess broad discretionary powers over the scope of closing arguments. State v. Perez-Cervantes, 141 Wn.2d 468, 474-75, 6 P.3d 1160 (2000). The trial court should restrict the argument of counsel to the facts in evidence. Perez-Cervantes, 141 Wn.2d at 475.

We review a trial court's decision to limit the scope of closing argument for an abuse of discretion. Perez-Cervantes, 141 Wn.2d at 475. A trial court abuses its discretion "'only if no reasonable person would take the view adopted by the trial court.'" Perez-Cervantes, 141 Wn.2d at 475 (quoting State v. Huelett, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979)).

Elmesai first argues that the trial court erred when it sustained the State's objection to his discussion of the prosecution's statements to L.R. that if she tells the truth, the State would not prosecute her. Elmesai asserts that State v. Frost supports his position. 160 Wn.2d 765, 161 P.3d 361 (2007). In Frost, by preventing counsel from arguing that the State failed to meet its burden, the trial court lessened the State's burden to some degree, thus infringing on Frost's due process rights. 160 Wn.2d at

777-78. Despite finding that the trial court abused its discretion, our Supreme Court held that any error was harmless. Frost, 160 Wn.2d at 779.

Here, during closing argument, defense counsel discussed L.R.'s credibility and argued, "[s]he couldn't even tell you guys the truth. Even after the prosecutor told her repeatedly, even in front of you, 'If you just tell us the truth, we're not going to prosecute you.' There's no motive for her to lie." The trial court sustained the State's objection to these comments. The court then instructed the jury to disregard "the statement about what [was] said about deals with the prosecutor."

The evidence presented showed that the State made several attempts to assure L.R. that it was ok to tell the truth about her drug use. In a follow up interview with the prosecutor, lead detective, and a victim advocate, the prosecutor assured L.R. that providing the accurate answers and the entire story would not result in charges and that L.R. would not get in trouble with the prosecutor's office or Seattle Police Department for activities surrounding this event. The lead detective testified that L.R. downplayed her addiction, and the intent of this later interview of L.R. was to let her know that discussing her drug addiction would not result in prosecution as it related to this case. He explained that it is extremely common in cases like these for a victim to have difficulty understanding that just because you are doing drugs does not give someone else the right to do whatever they want.

Thus, defense counsel's statement that "if you just tell the truth, we're not going to prosecute you" was an accurate statement of the evidence. Moreover, contrary to the trial court's instruction, defense counsel did not argue that a deal was made with the

prosecutor.  The trial court erred in sustaining the objection and instructing the jury to disregard the statement.

But where a trial court improperly limits counsel's argument, reversal is not required if, beyond a reasonable doubt, the jury verdict would have been the same without the limitation.  Osman, 192 Wn. App. at 378.  We look to the untainted evidence to determine whether the evidence is so overwhelming that it necessarily leads to a finding of guilt.  Frost, 160 Wn.2d at 782.  Here, the limitation on argument did not affect the evidence presented.

Elmesai's story was not believable.  He claimed that L.R. received a serious cornea laceration from "brushing her face" against a "delicate" wine glass.  Although Elmesai's defense was that L.R. was lying, L.R. had no apparent motivation to endure an invasive sexual assault examination and a criminal trial.  Furthermore, when the police came to Elmesai's apartment, he knew why they were there, tried to run, gave them a false name, and ultimately made up a story that was inconsistent with his later trial testimony, telling the police that "one chick" had "broke into" his apartment.

Moreover, the limitation on argument did not prevent defense counsel from arguing that L.R. was not credible.  After the court sustained the State's objection, defense counsel told the jury—consistent with the court's instructions—that "everything I say is an argument.  If there's evidence that speaks to something different, please rely on your evidence."  Counsel then argued:

> But we heard "Tell the truth."  "Tell the truth."  Detective Belgard met her in February.  "Just tell the truth.  That's all you've got to do.  Just tell the truth.  We just want to know the truth."  And when she got in here and we asked her to tell you the truth and we asked her about her [drug use], she still lied to you.  You guys saw it and you heard it with your own ears.

-6-

> Please see it with your own eyes that on January 10th, on that day, she contacted him. "Got any smoke? Can I come through?" She was using on January 10th.

The trial court's error in limiting argument was harmless.

Second, Elmesai argues that the trial court erred when it sustained the State's objection to his discussion of whether use of methamphetamine could have affected L.R.'s pain tolerance. We disagree.

Defense counsel asked, "[h]ere's a question. Is it possible that meth caused her pain to subside?" The trial court sustained the State's objection to this question. But immediately following this objection, defense counsel resumed this train of thought, asserting "[L.R.] used meth that evening . . . what impact did that have on her pain when she was spending eight hours in the apartment?" And again, "Why the delay? What impact does meth have on pain?" Finally, "if there's meth in her system and if she's not complaining of any pain, if there's no blood everywhere, doesn't it make sense that he believes that she's giving consent?"

While there was evidence that L.R. intended to smoke methamphetamine that night, neither party testified that they used methamphetamine that night. L.R. testified that the eye injury caused her excruciating pain. Testimony by her treating ophthalmologist supported her testimony. Elmesai was the only witness who testified that using meth dulls his pain. The argument that methamphetamine use affected L.R.'s pain tolerance was properly limited as speculative. In any event, defense counsel was not further limited in making this inference. The trial court did not abuse its discretion.

B. Prosecutorial Misconduct

Elmesai argues that the prosecutor invoked a harmful stereotype that Muslim men are violent and strive to dominate women during questioning of a defense witness and that this was race-based misconduct. We disagree.

Elmesai did not object to the prosecutor's alleged misconduct below. Thus, to prevail on a claim of prosecutorial misconduct raised for the first time on appeal, a defendant must generally show improper conduct and prejudice as well as show that the prosecutor's actions were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

But when the allegation is race-based misconduct, this court applies a separate analysis. State v. Zamora, 199 Wn.2d 698, 709, 512 P.3d 512 (2022). This court looks to see whether the prosecutor "'flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence.'" Zamora, 199 Wn.2d at 709 (quoting State v. Monday, 171 Wn.2d 667, 680, 257 P.3d 551 (2011)). This is determined by asking whether an objective observer could view the prosecutor's comments as an appeal to the jury's potential prejudice, bias, or stereotypes. See Zamora, 199 Wn.2d at 718. "The objective observer is a person who is aware of the history of race and ethnic discrimination in the United States and aware of implicit, institutional, and unconscious biases, in addition to purposeful discrimination." Zamora, 199 Wn.2d at 718. We assess the conduct within the context of trial. Zamora, 199 Wn.2d at 718. In doing so, we consider the broader context, such as the frequency of improper comments, their intended purpose, the subject, and the

type of case. <u>State v. Loughbom</u>, 196 Wn.2d 64, 75, 470 P.3d 499 (2020). When a prosecutor flagrantly or apparently intentionally appeals to a juror's potential racial or ethnic prejudice, bias, or stereotypes, the resulting prejudice is incurable and requires reversal. <u>Zamora</u>, 199 Wn.2d at 721 (modifying the constitutional harmless error standard announced in <u>Monday</u>).

This court recently reversed a criminal conviction based on prosecutorial misconduct for two race-based comments. <u>See</u> <u>State v. Ibarra-Erives</u>, 23 Wn. App. 2d ___, 516 P.3d 1246 (2022). The case involved allegations of constructive possession of methamphetamine and heroin and whether the defendant intended to sell the drugs. <u>Ibarra-Erives</u>, 516 P.3d at 1252. During his direct testimony, the lead detective, told the jury that when dealing with heroin, "25 grams is considered an ounce" and that "the term on the street is it's a Mexican ounce." <u>Ibarra-Erives</u>, 516 P.3d at 1249. The prosecutor then repeated the term twice during closing argument. <u>Ibarra-Erives</u>, 516 P.3d at 1252. The court found use of the street term attributing that practice to a particular racial or ethnic group not relevant and "when the defendant appears to be a member of that same racial or ethnic group, such comments improperly suggest that he is more likely to have packaged or possessed the drugs." <u>Ibarra-Erives</u>, 516 P.3d at 1252. As a result, the court held that an objective observer could view the prosecutor's use of the term as an apparently intentional appeal to jurors' potential bias. <u>Ibarra-Erives</u>, 516 P.3d at 1252.

Here, during the trial, L.R. testified that the day of the sexual assault was her first time at Elmesai's apartment and before that they were only alone together for a brief moment one time. Elmesai disputed this account and offered testimony from his friend

Cassandra Lewis that she was introduced to L.R. in December, one month before the sexual assault, at Elmesai's apartment. Lewis stated that L.R.'s "shoes were off, and it looked like she was just lounging around like she had been there for a while." On cross-examination, the following interaction occurred:

> [Prosecutor]: Do you know Mr. Elmesai's religion?
> [Lewis]: No, I do not.
> [Prosecutor]: Do you know anything about Muslims and whether they allow shoes in their house?
> [Lewis]: No, I do not.

The only other time religion was raised was during voir dire when counsel for Elmesai asked whether anyone felt uncomfortable handling a case involving a Muslim, or if the name "Ahmed Mohamed Elmesai" would conjure up any bias.

The State argues the prosecutor's line of questioning was meant to provide a reason, other than intimacy, for why L.R.'s shoes might have been off inside Elmesai's apartment. Elmesai argues the prosecutor was invoking a stereotype of Muslim men as controlling and domineering.

"[N]ot all express mentions of race will carry the danger of appealing to jurors' potential racial bias." Zamora, 199 Wn.2d at 715. Here, we conclude that the prosecutor did not flagrantly or apparently intentionally appeal to bias. First, the reference to Elmesai's religion was somewhat relevant. While the question by the prosecutor may have been inartful, it was relevant to ask if there may have been another reason for L.R. to have her shoes off in Elmesai's home when there was a dispute about the nature of their relationship. Second, the question did not invoke a negative connotation of Muslim men. In Ibarra-Erives, the term "Mexican ounce" improperly suggested that the defendant was more likely to have packaged and

-10-

possessed drugs.  516 P.3d at 1252.  In Zamora, the prosecutor referenced border security and illegal immigration at least 10 times, questioning that was completely irrelevant to the subject matter of the case and invoking harmful stereotypes highlighting the defendant's perceived ethnicity.  199 Wn.2d at 719.  Here, it is a stretch to argue that referencing that removing shoes in the home plays into a harmful stereotype.  This is a wide spread practice in many cultures and does not alone carry any negative connotation.  Finally, the comments were only made once.

Thus, an objective observer, aware of this country's history of race and ethnic discrimination and aware of implicit, institutional, and unconscious biases, would not view the prosecutor's questions as an appeal to the jury's potential prejudice, bias, or stereotypes.  Zamora, 199 Wn.2d at 718.  We conclude that Elmesai has not established prosecutorial misconduct.

C.  Jurors Dismissed for Cause

Elmesai argues the trial court erred in dismissing prospective jurors 17 and 34 for cause.  Elmesai argues that the trial court relied on pretexts in dismissing the jurors.  The State argues that Elmesai's claim is barred by RAP 2.5(a) because he cannot show manifest error.  We agree with the State.

During voir dire, the defendant's constitutional rights to an impartial jury are not automatically violated when the trial court erroneously dismisses a potential juror.  State v. Van Elsloo, 191 Wn.2d 798, 816, 425 P.3d 807 (2018).  Parties do not have vested rights to have a particular member of the panel sit on the jury until the juror has been accepted and sworn.  Van Elsloo, 191 Wn.2d at 816.  Further, erroneously dismissing a potential juror does not cause a biased juror to be impaneled and it is presumed that the

juror chosen in the place of a rejected juror is an impartial juror. Van Elsloo, 191 Wn.2d at 816. If a juror is dismissed before being impaneled, the defendant is not entitled to a new trial even if the juror was rejected by the court on insufficient grounds. Van Elsloo, 191 Wn.2d at 817.

Here, both prospective jurors 17 and 34 were dismissed for cause before being impaneled. Elmesai has not argued or presented evidence that a biased juror sat on his jury. Thus, Elmesai cannot establish that his rights to an impartial jury were violated by the dismissals of these jurors.

Further, Elmesai cannot establish that these jurors were rejected on insufficient grounds. Because the trial court is in the position to observe a potential juror's demeanor and otherwise make judgments about their ability to be impartial, on appeal we review a trial court's decision for abuse of discretion. State v. Noltie, 116 Wn.2d 831, 839-40, 809 P.2d 190 (1991). Here, we find that the trial court did not abuse its discretion.

Prospective juror 17's responses were not equivocal. On his questionnaire he answered that he had concerns about his ability to be fair and impartial. He answered yes to the question "[d]o you have strong feelings, either positive or negative, about law enforcement officers?" During questioning, he explained that his work with a professional organization for public defenders exposed him to police and prosecutorial misconduct and "skewed" his perspective on the system. When asked whether he could be fair and impartial in this case, he stated: "Who knows? I would honestly really try to be." But he also said that his exposure to these issues, self-study, and personal experience "give me a lot of pause as to trusting particularly law enforcement." He also

-12-

explained that he has "some misgivings" about his ability to be fair and while he would "try to be a balanced person . . . [he has] been very exposed to this and heard a lot of horror stories." He admitted that he would "systemically" be leaning towards the defense.

Thus, the State moved for cause to dismiss prospective juror 17. Defense counsel asked whether he could make decisions based strictly off the evidence presented to him. He replied:

> I would definitely try to. But again, I'm just trying to—I can't predict what I would do depending on the evidence or the circumstances and how the evidence was collected, but I mean, I think that's something that I'm not necessarily trustful of that. I just did a whole training on the toxicology lab and methamphetamines and how ridiculously that was handled. Yeah, I would have, I would have trouble trusting that . . . I would do my best, absolutely. But that is just part of my life.

The State reemphasized its for cause challenge based on prospective juror 17's leanings and the court dismissed him.

While Elmesai argues that prospective juror 17 was dismissed based on distrust of law enforcement, a historically racist reason, prospective juror 17 made unequivocal statements that based on his job he held a bias towards the defense. Because courts presume actual bias where there is a statement of partiality without a subsequent assurance of impartiality, the trial court did not abuse its discretion by dismissing prospective juror 17 for cause. State v. Guevera Diaz, 11 Wn. App. 2d 843, 855, 456 P.3d 869 (2020) (quoting Miller v. Webb, 385 F.3d 666, 674 (6th Cir. 2004)).

As for prospective juror 34, he also indicated in his questionnaire that he had concerns about his ability to be fair and impartial. During questioning, he was asked a few questions about the type of evidence he would expect to see in a case like this and

whether a victim's word alone is enough, he answered that he would need something more but he wasn't really sure what.

When asked about his concerns about his ability to be fair and impartial, he responded "[m]aybe like the lack of evidence maybe" but then said he didn't really remember what his concerns were when filling out the questionnaire. When the State circled back, prospective juror 34 said his concerns were "[m]aybe just the difficulty of making the decision." The State asked if he was uncomfortable discussing this case and he responded "sort of . . . yes." After asking if he wanted to be excused, he said yes, and the State moved to excuse him. Defense objected and the court agreed with defense counsel. The State resumed questioning prospective juror 34:

> [Prosecutor]: When you say that you are uncomfortable sitting in a case like this, are you uncomfortable discussing topics of sexual assault or something else?
> [Juror 34]: Topics.
> [Prosecutor]: The topics. And do you think that it would be difficult for you to deliberate and discuss topics of sexual assault if you were seated as a juror?
> [Juror 34]: Yes.
> [Prosecutor]: Do you think that you would be unable to or unwilling to discuss certain things about sexual assault because you might feel uncomfortable?
> [Juror 34]: Yes.

The State renewed its motion and the court asked what was making him uncomfortable, he replied "[j]ust nervousness" about the topic in general. The court dismissed prospective juror 34.

Later in the proceedings, the State asked to make the record a little clearer on prospective juror 34. The State explained:

> he had a very tough time saying more than just a word or two or just a couple of words at a time . . . he didn't want to really participate, actively

participate in the voir dire process. At one point, he had noted in his questionnaire that he had concerns about being able to be fair and impartial. And when I asked him to expand on that, he clearly had difficulty shedding any more light about what he meant, which caused the State a lot of concern. And then I asked him whether he'd be able to deliberate actively with other jurors, and he clearly had a lot of discomfort as to that and, again, was not really giving us fully formed substantive answers about his discomfort or things that were clearly causing him trouble sitting in court. So the State had a lot of concerns about him being able to participate in voir dire but also about him being able to participate in deliberations should he have been picked.

The court responded, "He was mostly inarticulate . . . Not in a condescending way. I don't mean it that way. Just really almost nonresponsive."

While Elmesai argues that prospective juror 34 was dismissed for pretextual reasons, prospective juror 34 gave a statement of partiality without a subsequent assurance of impartiality. Questioning did not soften or rebut his statement of partiality. And while prospective juror 34 had trouble articulating why he felt he could not be fair and impartial, he clearly stated that he could not be fair and impartial. Thus, the trial court did not abuse its discretion by dismissing him.

Because there was evidence that both prospective jurors were biased, we find that the trial court did not abuse its discretion in dismissing them for cause.

D. Alternate Jurors

Finally, Elmesai argues that the trial court violated his constitutional right to a fair and impartial jury by failing sua sponte to dismiss jurors 3 and 4. We disagree.

The State relies on State v. Schierman to argue that there is no violation of the right to an impartial jury when the challenged juror ultimately does not deliberate. 192 Wn.2d 577, 632, 438 P.3d 1063 (2018). In Schierman, the defendant moved to dismiss a juror for cause but was denied. 192 Wn.2d at 625. But the juror was excused before

deliberations. Schierman, 192 Wn.2d at 631. The court held that because the defendant did not allege that this error indirectly resulted in the seating of a biased juror, he was not entitled to relief. Schierman, 192 Wn.2d at 632. In support of its position, the Schierman court cited cases in which the trial court refused to dismiss a prospective juror for cause and the defendant used a peremptory challenge to remove the allegedly biased juror. See United States v. Martinez-Salazar, 528 U.S. 304, 307, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000); State v. Fire, 145 Wn.2d 152, 154, 34 P.3d 1218 (2018).

Washington courts have held that errors related to alternate jurors are harmless where the alternate jurors do not deliberate. For instance, in State v. Rivera, the trial court gave the parties fewer than the required number of peremptory challenges for alternate jurors. 108 Wn. App. 645, 657, 32 P.3d 292 (2001), abrogated on other grounds by State v. Sublett, 176 Wn.2d 58, 72, 292 P.3d 715 (2012). The court found the error was harmless because it did not prevent the defendant from having a fair trial before a fair and impartial jury. Rivera, 108 Wn. App. at 651-52.

Here, jurors 3 and 4 were randomly selected as the alternates and were dismissed before deliberations. While this case differs from Schierman because neither juror 3 nor juror 4 were challenged for cause during voir dire, ultimately jurors 3 and 4 were excused before deliberations. As in Schierman, Elmesai has not alleged that this error resulted in the seating of a biased juror.

Thus, we find that because neither of the alternates deliberated, and Elmesai has not shown that the panel was not impartial, the trial court did not err.

Affirmed.

WE CONCUR:

_Manos, J._

_Díaz, J._

_Chung, J._