IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 79204-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| JOHNATHON CHRISTOPHER STONER, | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — Johnathon Christopher Stoner appeals his jury convictions for third degree child molestation of J.B. and communication with minor E.F. for immoral purposes. Stoner argues that the prosecutor improperly commented on his constitutional right to represent himself and confront witnesses at trial, that the court failed to give an adequate curative instruction to address the error, and that he received ineffective assistance of counsel. We affirm.

## FACTS

Stoner lived with his longtime partner Misty Guerrero. Stoner and Guerrero were raising four children in their home. Stoner is the biological father of the two younger children, R.S. and J.S. Stoner acted as a stepfather to J.B. and P.G., Guerrero's two children from earlier relationships. Guerrero's daughter J.B. is the oldest child.

Citations and pin cites are based on the Westlaw online version of the cited material.

About the time J.B. entered middle school, Stoner began to "wrestle" with her. He also frequently "cuddle[d]" with her wearing only his underwear. This often occurred in Stoner's bed while Guerrero was at work.

J.B. had just turned 15 years old in November 2016. On December 26, J.B.'s younger brother P.G. called Guerrero at work and told her to come home because J.B. was "freaking out." Guerrero arrived to find J.B. sitting on the floor, crying. J.B. refused to speak with her mother in front of Stoner. Guerrero brought J.B. into her bedroom, closed the door, and asked J.B. what happened. Guerrero said, "I had to really pry at [J.B.]. She wasn't giving me any information." Eventually, J.B. told her mother that Stoner "had done things" to her or "had her do something." J.B. made a "back and forth" hand gesture that Guerrero understood to mean that Stoner had made J.B. rub his penis.

J.B. told her mother that Stoner had forced her to do this on more than one occasion. In an effort to convince Guerrero that she was telling the truth, J.B. told Guerrero that her underwear had "stuff on it" from when Stoner had ejaculated earlier that day. J.B. retrieved her underwear from the dirty laundry pile in Stoner and Guerrero's bedroom and showed them to her mother. J.B. later said, "I was just trying to get her to believe me. I was doing whatever I could to get her to believe me." Guerrero held J.B.'s underwear in her hand and confronted Stoner. Guerrero said Stoner "wouldn't say anything to me. He just shook his head."

Guerrero called 911. Skagit County Sherriff's Deputy Brad Holmes responded and took a statement from J.B. J.B. was "obviously upset" and

"uncomfortable." She told Deputy Holmes that she "had been jacking off [her] dad" that day and that he "ejaculated on [her] underwear." She also said Stoner "would touch her vagina." In a written statement, J.B. stated:

> [Stoner] expects me to come lay down with him and Jack him off. Bec[a]use if I did not I would get in a[ ]lot of tro[u]ble. . . . [H]e pulled down my pan[ ]ts (leggings) and pulled up my shirt and made himself put his priv[a]te area on me and I did not want that.

Deputy Holmes collected J.B.'s underwear from the laundry hamper for forensic testing.

Deputy Holmes arrested Stoner and read him his Miranda[1] rights. Stoner waived his rights and agreed to speak with Deputy Holmes about the incident. Deputy Holmes asked if Stoner's semen would be on J.B.'s underwear. Stoner denied that it would. After Deputy Holmes told Stoner that he talked to Guerrero about the underwear, Stoner admitted that "it was possible" there would be semen on J.B.'s underwear and that it may be from his bed sheets. He explained that he suffers from premature ejaculation and "ejaculates throughout the night in his sleep," so some of his semen may have "rubbed on" J.B.'s underwear when she was on his bed that morning.

The State charged Stoner with communication with a minor for immoral purposes, four counts of child molestation in the third degree, and one count of indecent liberties as to J.B. The State also charged Stoner with a second count of communication with a minor for immoral purposes related to a July 2016 incident with J.B.'s 14-year-old friend E.F.[2]

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] Because the facts of the July 2016 incident involving E.F. are unrelated to the issues on appeal, we do not address them.

Approximately six weeks after his arrest, Guerrero posted bail for Stoner. J.B. then recanted her allegations. She claimed that she made up the accusations to get Stoner "in trouble" because she was angry with him for taking away her cell phone.

Stoner waived his right to counsel and represented himself for the majority of his trial. Standby counsel stepped in to conduct Stoner's direct examination and to make closing arguments.

At trial, Washington State Patrol Crime Laboratory technician Carol Vo testified about the forensic testing of J.B.'s underwear. The exterior front crotch of the underwear tested positive for a protein called "p30," which is present in very high levels in semen.[3] Vo also found a mixture of both male and female DNA[4] components on the underwear. The male component matched the DNA profile of Stoner. The female component matched the DNA profile of J.B.

Stoner's theory at trial was that his DNA could have transferred to J.B.'s underwear in the family laundry pile. On cross-examination, Vo testified that it was "possible" that Stoner's DNA transferred to J.B.'s underwear in the laundry but that it was unlikely.

In support of his theory, Stoner cross-examined J.B. about whether she heard Guerrero and him having sex the night before the incident. He did not ask Guerrero the same question. Nor did he offer testimony on the topic himself when he testified on his own behalf. In her closing argument, the prosecutor

---

[3] Vo discussed that p30 protein is also found in smaller amounts in other bodily fluids but her tests were not sensitive enough to detect them.

[4] Deoxyribonucleic acid.

4

remarked that Stoner's choice to elicit that testimony from J.B. rather than from Guerrero or himself when he testified on his own behalf was "interesting" and not "normal."

At the close of the evidence, the State dismissed all but one count of child molestation in the third degree as to J.B.[5] The jury convicted Stoner as charged and the trial court imposed a standard-range sentence. Stoner appeals.[6]

ANALYSIS

Prosecutorial Misconduct

Stoner argues that the prosecutor committed misconduct by commenting on his constitutional right to represent himself and to confront witnesses. We disagree.

This court applies two standards of review for prosecutorial misconduct claims based on whether a defendant objected at trial. State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). Under both standards, a defendant must prove the prosecutor's conduct was both improper and prejudicial. Emery, 174 Wn.2d at 756. Where a defendant properly objects to a prosecutor's conduct at trial, the defendant must prove the prosecutor's misconduct resulted in prejudice that had a "substantial likelihood of affecting the jury's verdict." Emery, 174 Wn.2d at 760. Where a defendant does not object at trial, he or she is deemed to have waived any error "unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting

---

[5] The State did not dismiss the count of communication with a minor for immoral purposes related to the July 2016 incident involving E.F.

[6] Stoner appeals both convictions; however, his assignments of error relate to the incident with J.B. only.

prejudice." Emery, 174 Wn.2d at 760-61.[7]

Stoner's trial strategy was to discredit the DNA evidence. He argued that his DNA could have transferred to J.B.'s underwear in the family laundry. On cross-examination, Stoner asked J.B., "Were you aware at all that your mother and me had sexual intercourse the night before" December 26, 2016. He did not ask Guerrero a similar question. And although he testified on his own behalf, Stoner himself did not offer testimony on the topic.

In her closing remarks, the prosecutor argued:

> Speaking of "normal," isn't it interesting that in this particular case, when the defendant was handling his own examination of the witnesses, the person that he chose to ask about whether he had sexual relations with [Guerrero] the night before was his stepdaughter, was [J.B.]. Why would he do that? He never asked [Guerrero]. He never testified to that himself. But it's normal to ask the child in the house, "Oh, by the way, did you hear your mother and I having sex last night?"

Standby counsel objected on the ground that "comments and questions of the lawyer are not evidence." The court instructed the jury to "determine what evidence is presented in the case by witnesses or the exhibits" and reminded them that the statements and arguments of the lawyers are "not evidence that you are to consider."

Stoner argues that the prosecutor's argument was an improper attempt to use Stoner's exercise of his constitutional rights against him. The State contends that the remarks were not an explicit or implicit attempt to draw any inferences from Stoner's choice to represent himself.

---

[7] The State argues that Stoner did not object with sufficient specificity at trial and urges this court to apply the more rigorous standard. Because we conclude there was no prosecutorial misconduct, we need not reach this issue.

A prosecutor may not invite the jury to draw a negative inference from a defendant's exercise of a constitutional right. State v. Jones, 71 Wn. App. 798, 811-12, 863 P.2d 85 (1993). However, the prosecutor's statements must go beyond a mere mention of a constitutional right; the prosecutor must have " 'manifestly intended the remarks to be a comment on that right.' " State v. Gregory, 158 Wn.2d 759, 806-07, 147 P.3d 1201 (2006) (quoting State v. Crane, 116 Wn.2d 315, 331, 804 P.2d 10 (1991), abrogated on other grounds by In re Pers. Restraint of Andress, 147 Wn.2d 602, 56 P.3d 981 (2002)), overruled on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014). So long as the focus of the prosecutor's argument is not on the " 'exercise of the constitutional right itself,' " the argument does not "infringe upon a constitutional right." Gregory, 158 Wn.2d at 807 (quoting State v. Miller, 110 Wn. App. 283, 284, 40 P.3d 692 (2002)).

Stoner relies on State v. Espey, 184 Wn. App. 360, 336 P.3d 1178 (2014), to support his argument that the prosecutor's remarks were a comment on his exercise of a constitutional right. In Espey, the prosecutor argued that when considering Espey's statement to police, the jury should "[k]eep in mind that [Espey] had already consulted with two attorneys, . . . . [h]e had lots of time to figure out what story he was going to tell the police." Espey, 184 Wn. App. at 364-65. Division Two of this court concluded that the State's argument was an improper comment on Espey's exercise of his constitutional right to representation. Espey, 184 Wn. App. at 366. The court reasoned that the State penalized Espey by creating an inference of guilt from his election to exercise his

7

right to speak with counsel.  Espey, 184 Wn. App. at 367-68.

In contrast, here, the prosecutor did not invite the jury to make negative inferences from the fact that Stoner chose to represent himself.  Rather, the prosecutor's statement focused on Stoner's trial strategy, the testimony he chose to elicit, and the witness from whom he chose to elicit that testimony.  Because the prosecutor's remarks did not focus on Stoner's exercise of the constitutional right itself, the remarks did not infringe upon Stoner's constitutional right to self-representation.  The prosecutor did not commit misconduct.

Curative Instruction

Stoner contends that the court's curative instruction was not sufficient to remedy any prejudice caused by the prosecutor's improper remarks during closing argument on Stoner's constitutional right to represent himself.  We disagree.

Stoner objected to the prosecutor's argument on the ground that "Mr. Stoner was acting as a lawyer" and that "[t]he comments and questions of the lawyer are not evidence."  Standby counsel asked the court to remind the jury that the responses from witnesses are the evidence.  The court then instructed the jury:

> Members of the Jury, just as a reminder, that you determine what evidence is presented in the case by witnesses or the exhibits, that the statements by lawyers and arguments — during arguments or during the questioning, that's not evidence that you are to consider.

The trial court's curative instruction accurately addressed Stoner's objection.  We presume juries follow instructions of the court.  State v. Osman, 192 Wn. App. 355, 379, 366 P.3d 956 (2016).  Because we conclude that the

prosecutor did not comment on Stoner's constitutional right to represent himself, no additional instruction was necessary.

<u>Ineffective Assistance of Counsel</u>

Stoner argues that his trial attorney was ineffective for failing to object to the adequacy of the trial court's curative instruction.

To prove ineffective assistance of counsel, an appellant must prove both deficient performance and resulting prejudice. <u>State v. Thomas</u>, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987) (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Because we conclude that the prosecutor did not improperly comment on Stoner's exercise of his constitutional rights and that the court's curative instruction adequately addressed counsel's objection at trial, Stoner fails to show that his counsel's performance was deficient.

We affirm the convictions for third degree child molestation of J.B. and communication with minor E.F. for immoral purposes.

_____
Brennan, J

WE CONCUR:

_____   _____
                                   Mann, C.J.