IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

              Respondent,

       v.

WILLIAM EARL TALBOTT II,

              Appellant.

No. 80334-4-I

DIVISION ONE

ORDER DENYING MOTION
FOR RECONSIDERATION
AND WITHDRAWING AND
SUBSTITUTING OPINION

Appellant filed a motion for reconsideration on December 18, 2023. This court called for an answer on December 21, 2023, which respondent filed on January 5, 2024. After review of the motion and answer, a panel of this court has determined that the motion for reconsideration shall be denied. The court has further determined that the opinion filed December 4, 2023 shall be withdrawn and a substitute opinion filed.

Now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed December 4, 2023 shall be withdrawn and a substitute opinion filed.

_____
Hazelrigg, A.C.J.

Díaz, J.
_____

Bowman, J.
_____

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>          Respondent,<br><br>      v.<br><br>WILLIAM EARL TALBOTT II,<br><br>          Appellant. | No. 80334-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, A.C.J. — William Earl Talbott II appealed from a guilty verdict on two counts of aggravated murder in the first degree, asserting numerous evidentiary and constitutional errors. On remand from the Supreme Court, we hold that Talbott fails to demonstrate a basis for reversal and affirm his convictions. However, we remand for the trial court to strike the erroneous firearm enhancement on Talbott's judgment and sentence.

FACTS

This case comes to us on remand from our Supreme Court. *State v. Talbott* (*Talbott* II), 200 Wn.2d 731, 733, 521 P.3d 948 (2022). The underlying facts are set out in detail in this court's unpublished opinion and only briefly summarized here. *See State v. Talbott* (*Talbott* I), No. 80334-4-I, slip op. at 1-3 (Wash. Ct. App. Dec. 6, 2021) (unpublished) https://www.courts.wa.gov/opinions/pdf/803344.pdf. In November 1987, the bodies of Jay Cook and Tanya Van Cuylenborg were found in rural Snohomish and Skagit counties, respectively. *Id.* at 2. A DNA profile was

developed from semen collected from Van Cuylenborg's pants and vaginal swab; this profile was matched to Talbott through genealogy mapping nearly three decades later. *Id.* at 2-3. After a jury trial, Talbott was found guilty of two counts of aggravated murder in the first degree. *Id.* at 3. Talbott appealed, and this court reversed, holding that the seating of a juror who expressed actual bias necessitated reversal. *Id.* at 12-13. The State of Washington petitioned for review by our State Supreme Court, which was granted. *Talbott* II, 200 Wn.2d at 737. The Supreme Court reversed and held that "Talbott is not entitled to have his for-cause challenge to juror 40 considered on appeal" because he "did not attempt to strike juror 40 with an available peremptory challenge, he did not exhaust his peremptory challenges on other jurors, and he affirmatively accepted the jury panel as presented." *Id.* at 748. The Supreme Court reversed and remanded to this court "to address the claims it did not reach in its prior opinion." *Id.* We reach those issues here.

ANALYSIS

I.    Sufficiency of Evidence

Under the due process clause of the federal constitution, the State must prove every element of a crime beyond a reasonable doubt. *State v. Chacon*, 192 Wn.2d 545, 549, 431 P.3d 477 (2018) (citing U.S. CONST. amend. XIV). When analyzing whether evidence is sufficient to uphold a jury's verdict, this court applies a deferential standard of review. *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011). We view "the evidence in the light most favorable to the State," to determine whether "any rational trier of fact could have found guilt

beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* We defer to the jury to make determinations on the credibility of witnesses, resolve conflicting evidence, and evaluate the persuasiveness of the evidence. *State v. Francisco*, 148 Wn. App. 168, 175, 199 P.3d 478 (2009). Both direct and circumstantial evidence may be considered to support the jury's verdict and "[a] trier of fact may rely exclusively upon circumstantial evidence to support its decision." *State v. Jackson*, 145 Wn. App. 814, 818, 187 P.3d 321 (2008).

Here, Talbott was convicted of two counts of aggravated murder, one count for Van Cuylenborg and a second for Cook. The State was required to prove the following elements:

(1) That on or about the 18th day of November, 1987, through the 24th[1] day of November, 1987, the defendant acted with intent to cause the death of [Van Cuylenborg and Cook];
(2) That the intent to cause the death was premeditated;
(3) That [Van Cuylenborg and Cook] died as a result of the defendant's acts; and
(4) That any of these acts occurred in the State of Washington.

In addition to finding these elements were met, the jury found the following aggravating circumstances:

a. There was more than one person murdered and the murders were part of a common scheme or plan or the result of a single act of the person; or

b. The murder was committed in the course of, in furtherance of, or in immediate flight from robbery in the first degree or second degree, rape in the first or second degree, or kidnapping in the first degree.

---

[1] The date range charged by the State as to Cook's murder was set out in the charging document and jury instructions as on or about November 18 through 26.

Talbott asserts the State failed to prove that he caused the deaths of Van Cuylenborg and Cook beyond a reasonable doubt. He concedes that he had sexual contact with Van Cuylenborg and made physical contact with the van the couple was driving, as demonstrated by the presence of his DNA on Van Cuylenborg's pants and body and his palm print found on the van's back window, but he argues this evidence is insufficient to meet the State's burden of proof as to the aggravated murder of both victims.

At trial, much of the State's case rested upon circumstantial evidence. First, the State relied on the particulars of Van Cuylenborg and Cook's trip to Washington. The couple left their homes in Victoria, B.C., on November 18 to retrieve furnace parts for Cook's father. They planned to drive to Seattle, sleep in the van overnight, purchase the parts from Gensco Inc. the next morning, and then return home to Victoria later that day, November 19. The pair took the ferry from Victoria to Port Angeles. They were seen together in two different locations as they made their way to the Bremerton ferry terminal, where they arrived at around 10:00 p.m. on November 18. Van Cuylenborg and Cook were unfamiliar with the area; they got lost on their way to the Bremerton ferry and were redirected by a store clerk in Hoodsport. Van Cuylenborg's and Cook's bodies were found in separate counties, each in a remote area, while their van was located in a third county.

Second, the State relied on the condition of the bodies when they were found. When Van Cuylenborg's body was discovered, she was nude from the waist down, wearing socks but no shoes, with her bra pushed above her breasts.

She had been shot in the back of the head, suffering "a very close contact wound." The medical examiner determined Cook's cause of death was asphyxia due to ligature strangulation. Officers found zip ties connected together at each location where Van Cuylenborg and Cook's bodies were found, as well as in the van, though neither of the victims appeared to have been bound by zip ties or any other item.

Third, the State relied on Talbott's familiarity with the general area where Cook's body was found. Talbott had previously lived seven miles from the scene and had spent time with a friend photographing the area near the Skykomish River and Monroe Correctional Complex (a state prison), several miles from the location where Cook's body was found.

Talbott correctly identifies conflicting evidence and gaps in the State's case. The only physical injury identified as to Van Cuylenborg was the gunshot wound; there was no evidence presented of vaginal trauma or ligature marks indicating she had been bound. Talbott also notes that there was no testimony that Van Cuylenborg would not have consented to sexual activity and there was an unidentified non-sperm DNA profile resulting from the vaginal swab "indicat[ing] a third person there." Van Cuylenborg was killed by a gunshot wound and Cook was strangled with a dog collar and found with a pack of cigarettes shoved down his throat; Talbott was never known to possess firearms, smoke cigarettes, or own a dog.

Throughout trial and on appeal, the State relied on the foundational argument that, because Van Cuylenborg and Cook traveled together, Van

Cuylenborg would not have had consensual sexual intercourse with Talbott and therefore Talbott must have raped Van Cuylenborg. The State's theory rested on the inference that Talbott killed both either in furtherance of, flight from, or to cover up the rape. This argument rests on a number of presumptions about the relationship between the couple which simply cannot be known and is undercut by testimony that reflects the pair had been dating only four months and "had been having some problems lately." The State also maintains Van Cuylenborg was unlikely to have sexual intercourse with a stranger because she was menstruating. However, the only evidence presented that Van Cuylenborg was menstruating was the discovery of a used tampon in the van that was never tested for DNA and therefore never conclusively determined to be hers; the autopsy report did not indicate that she was menstruating at the time of her death. Ultimately, there was no evidence regarding Van Cuylenborg's sexual interests, proclivities, practices, or desires.

"'Circumstantial evidence is evidence of facts or circumstances from which the existence or nonexistence of other facts may be reasonably inferred from common experience.'" *Jackson*, 145 Wn. App. at 818 (internal quotation marks omitted) (quoting 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.01, at 124 (2d ed. 1994). Our case law permits the jury to rely entirely on this type of evidence in reaching its verdict. *Id.* Further, under our well-established jurisprudence, we must "defer to the trier of fact on issues of conflicting testimony, witness credibility and persuasiveness of the evidence." *State v. Higgs*, 177 Wn. App. 414, 436, 311 P.3d 1266 (2013); *see also, e.g., State*

- 6 -

*v. Merritt*, 200 Wn. App. 398, 408, 402 P.3d 862 (2017), *State v. Bryant*, 142 Wash. 417, 418-19, 253 P. 450 (1927). Accordingly, we defer to the jury here to navigate the conflicting evidence and evaluate its overall persuasiveness.

Under our deferential standard of review, there is sufficient evidence in the record for a rational juror to find the State met its burden of proof. A reasonable juror could have agreed with the State's theory of the case that, based on the DNA evidence, condition of Van Cuylenborg's body, and details of her trip with Cook, Talbott raped Van Cuylenborg and subsequently shot and killed her. A rational trier of fact could have likewise found Talbott committed the murder in the course of, furtherance of, or in immediate flight from the rape of Van Cuylenborg. Further, a reasonable juror could have agreed with the State's theory that Talbott killed Cook based on the connection between the victims and scenes. A rational juror could have found Talbott committed both murders as part of a common scheme or plan or as the result of a single act. Viewing all evidence and reasonable inferences in the light most favorable to the State, a reasonable juror could have found the State met its burden to prove the elements of the crimes as well as the aggravators.

II.     Exclusion of Evidence of Other Suspects

Talbott next alleges the trial court erred by excluding other suspect evidence, infringing on his right to present a defense. The United States Constitution and our state constitution guarantee all defendants the right to present testimony in their own defense. *State v. Broussard*, 25 Wn. App. 2d. 781, 785, 525 P.3d 615 (2023). However, this right "is not absolute" and "does not extend

to irrelevant or inadmissible evidence." *State v. Strizheus*, 163 Wn. App. 820, 830, 262 P.3d 100 (2011). Generally, irrelevant evidence is inadmissible. ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

We apply "a two-step standard of review when considering whether an evidentiary decision violated a defendant's due process 'right to present a defense.'" *Broussard*, 25 Wn. App. 2d at 786 (quoting *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019)). First, we "review the trial court's individual evidentiary rulings for an abuse of discretion" and then "consider de novo the constitutional question" of whether those rulings deprived the accused of their right to present a defense. *Arndt*, 194 Wn.2d at 797-98. This court only reaches step two, the constitutional question, "if the ruling was either within the trial court's discretion, or an abuse of discretion but harmless." *Broussard*, 25 Wn. App. 2d at 786.

The right to present a defense is not absolute; the evidence the accused seeks to admit must be at least minimally relevant. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). "The standard for relevance of other suspect evidence is whether there is evidence 'tending to connect' someone other than the defendant with the crime." *State v. DeJesus*, 7 Wn. App. 2d 849, 866, 436 P.3d 834 (2019) (internal quotation marks omitted) (quoting *State v. Franklin*, 180 Wn.2d 371, 381, 325 P.3d 159 (2014)). Essentially, this requires "a nonspeculative link between the other suspect and the charged crime." *Franklin*, 180 Wn.2d at

381.  "This inquiry, properly conducted, focuses on whether the evidence offered tends to create a reasonable doubt as to the defendant's guilt, not whether it establishes the guilt of the third party beyond a reasonable doubt."  *DeJesus*, 7 Wn. App. 2d at 866.  The defendant bears the burden to establish other suspect evidence is admissible.  *Strizheus*, 163 Wn. App. at 830.

During Talbott's cross-examination of former Snohomish County Sheriff's Department (SCSD) Detective Gregg Rinta, counsel sought to elicit testimony about two brothers who had been suspects early in the investigation, but whom the police ultimately ruled out because they did not match the DNA profiles.  An informant had reported to his parole officer that a friend told him an individual had confessed that he and his brother "killed the two kids."  Talbott's counsel argued that tips about "two brothers . . . who one of them had supposedly made some sort of confessional statement" and an informant who apparently indicated they heard a confession when they met one of the brothers in prison in 1990, provided an adequate foundation from which to elicit the other suspect evidence from Rinta.  Counsel explained:

> Then there was an interview with the informant. . . . He's the one that was at the Honor Farm.[2] His parole officer stated that [the informant] might have information about the murders. [The informant] denied involvement or knowledge of the murders. Sometime later [the informant] called Johnson, who was his parole officer. [The informant] said that when Johnson had left the trailer, a friend of his . . . came over to visit. The two of them started talking, and the subject of the murders came up. [The friend] began telling [the informant] the details of the murder, including the fact that a pack of cigarettes had been stuffed down the throat of the male victim. [The friend] told [the informant] that [a pair of brothers] killed the two kids, and that [one of the brothers] had told him about it.

---

[2] This appears to be a reference to a now-defunct program run by the Department of Corrections which was formally titled "Washington State Reformatory Farm."

The Court: When is the time frame for all of this?

[Defense counsel]: Well, the interview that the DOC [Department of Corrections] officer has with [the informant] was October 10, 1994. That was the date Detective Rinta spoke with Johnson, who is the DOC officer, the parole officer. And this is said to him during a visit some time—it says during a visit to [the informant]'s trailer in Snohomish some time that year, referring to 19—probably 1988. So some time after he was released June 22, 1988.

The court ruled that this offer of proof was insufficient to tie the specific individuals to the case and determined that the fact that someone had escaped from Honor Farm near the time of the murder was too tenuous a connection between the brothers and the present case. However, the court did allow defense counsel to question Rinta about how many other suspects were excluded solely on the basis of DNA.

The offer of proof by the defense as to this matter is lacking in that the connections are too attenuated and do not meet the baseline standard of admissibility. An offer of proof for other suspect evidence requires a more direct and admissible connection. *See State v. Ortuno-Perez*, 196 Wn. App. 771, 786-88, 385 P.3d 218 (2016). Talbott's offer of proof to the court lacked the requisite foundation to properly introduce this other suspect evidence and, as such, the trial court did not abuse its discretion in its evidentiary ruling. Without the necessary foundation to properly raise the other suspect evidence, Talbott failed to establish the relevance of the proffered testimony. Exclusion of evidence which is not minimally relevant under ER 401 does not violate the right to present a defense, and as such there was no constitutional error here.

III.     Improper Opinion Testimony

Talbott next argues SCSD Deputy James Scharf improperly opined on his guilt, invading the province of the jury.  This court reviews a trial court's ruling to admit or exclude evidence for an abuse of discretion.  *State v. Demery*, 133 Wn.2d 753, 758, 30 P.3d 1278 (2001).  "Generally, no witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant; such testimony is unfairly prejudicial to the defendant 'because it invades the exclusive province of the jury.'"  *Id.* at 759 (internal quotation marks omitted) (quoting *City of Seattle v. Heatley*, 70 Wn. App. 573, 577, 854 P.2d 658 (1993)).  Both experts and lay witnesses may offer opinion testimony in certain instances.  *See* ER 701; ER 702.  However, "[b]efore opinion testimony is offered, the trial court must determine its admissibility."  *State v. Montgomery*, 162 Wn.2d 577, 591, 183 P.3d 267 (2008).  To determine whether statements constitute impermissible opinion testimony, the court should consider the circumstances of the case, including the following: "(1) 'the type of witness involved,' (2) 'the specific nature of the testimony,' (3) 'the nature of the charges,' (4) 'the type of defense, and' (5) 'the other evidence before the trier of fact.'"  *Demery*, 144 Wn.2d at 759 (quoting *State v. Heatley*, 70 Wn. App. 573, 579, 854 P.2d 658 (1993)).

As a general rule, this court will not consider issues raised for the first time on appeal.  *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007).  However, a party may raise a manifest error of constitutional dimension even where there was no objection at trial.  RAP 2.5(a)(3).  "The defendant must identify a constitutional error and show how the alleged error actually affected the

defendant's rights at trial." *Kirkman*, 159 Wn.2d at 926-27. "It is a showing of actual prejudice that establishes the error as 'manifest,' allowing appellate review." *Id.* at 927 (quoting *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995)).

Scharf testified that he told his sergeant "that the case was solved." While the State contends this statement merely conveys the next steps taken by Scharf in his investigation, rather than an opinion on guilt, this is plainly incorrect. In *State v. Fleeks*, the trial court played a recorded interview between a detective and the defendant, wherein the detective stated "'this is probably your last chance to try to make yourself not look so cold-hearted and stuff like that.'" 25 Wn. App. 2d 341, 369, 523 P.3d 220 (2023). Our court held this statement "improperly commented on Fleeks's intent and effectually directed the jury to not believe Fleeks's self-defense theory," because the opinion "could easily appear to the jury as a belief that Fleeks was guilty of murder, not acting in self-defense" which "could interfere with the jury's ability to determine every fact beyond a reasonable doubt." *Id.* at 370. Similarly, here, Scharf's statement that "the case was solved," though perhaps made in the context of explaining what he said to his sergeant after receiving DNA results, effectively communicated to the jury that he believed Talbott committed the crime, interfering with the jury's ability to determine every fact beyond a reasonable doubt. "[A]n opinion as to the defendant's guilt is particularly prejudicial when it is expressed by a government official, such as a police officer." *State v. Thompson*, 90 Wn. App. 41, 46, 950 P.2d 977 (1998). Critically, Scharf was not just any law enforcement officer; he was the lead cold case detective and

was given leave by the court to sit with the prosecuting attorneys at counsel table throughout the trial. Scharf's prominent role in the investigation of the case and presence alongside prosecutors for the duration of the trial, which necessarily signaled his importance to the State in Talbott's apprehension and prosecution, greatly impacts the weight jurors likely gave to his conclusion that the "case was solved."

However, counsel for Talbott not only failed to object, but affirmatively used this comment to bolster their case theory in closing argument. The defense theory was that the DNA evidence that linked Talbott to Van Cuylenborg was insufficient to establish criminal activity, however law enforcement developed "tunnel vision" as to the recovered DNA and later match to Talbott. This improper comment by Scharf supported the defense theory of the case and, rather than object, counsel strategically utilized the comment in their final argument to the jury. Because it appears counsel's failure to object was a strategic one, there is no prejudice sufficient to establish a manifest error under RAP 2.5(a)(3). *See Kirkman*, 159 Wn.2d at 937. Talbott has failed to demonstrate entitlement to relief on this issue.

IV.    Evidence of Arrest

Talbott next contends the trial court abused its discretion when it admitted Scharf's prolonged description of his arrest. A trial court's ruling "to admit or exclude evidence is reviewed for an abuse of discretion." *State v. Scherner*, 153 Wn. App. 621, 656, 225 P.3d 248 (2009). As a preliminary matter, in its response brief, the State argues Talbott did not preserve this issue because counsel's objection was based on relevance, rather than objecting that "this evidence was

not relevant *as evidence of flight*." (Emphasis added.) The State is incorrect. "The propriety of an evidence ruling will be examined on appeal if the specific basis for the objection is 'apparent from the context.'" *State v. Braham*, 67 Wn. App. 930, 935, 841 P.2d 785 (1992) (quoting *State v. Pittman*, 54 Wn. App. 58, 66, 772 P.2d 516 (1989)). Trial counsel need not "cite a particular rule of evidence," so long as the legal basis for the objection "can be inferred from the context of the objection made below." *Id.* Here, counsel for Talbott objected "as to relevance." The court overruled the objection, and Scharf continued detailing his arrest of Talbott, drawing another objection, again based on relevance. Counsel then explained that "there is no relevance to doing a second-by-second recap of my client being handcuffed and arrested," and "[t]his is just a way to make Mr. Talbott look like a villain and a criminal by describing the manner in which he is arrested." The precise basis for the defense objection is abundantly clear from the record.

Evidence must be relevant to be admissible. ER 402. "Evidence of flight is admissible if it creates 'a reasonable and substantive inference that defendant's departure from the scene was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution.'" *State v. McDaniel*, 155 Wn. App. 829, 853-54, 230 P.3d 245 (2010) (internal quotation marks omitted) (quoting *State v. Freeburg*, 105 Wn. App. 492, 497, 20 P.3d 984 (2001)). This court will not accept "[p]yramiding vague inference upon vague inference [to] supplant the absence of basic facts or circumstances from which the essential inference of an actual flight must be drawn." *State v. Bruton*, 66 Wn.2d 111, 113, 401 P.2d 340 (1965). Further, even admissible evidence of

flight "tends to be only marginally probative as to the ultimate issue of guilt or innocence." *Freeburg*, 105 Wn. App. at 498. The Court of Appeals has analyzed the admissibility of evidence of flight under both ER 403 and ER 404(b). *See Id.* at 497-98 (ER 404(b)); *McDaniel*, 155 Wn. App. at 853-54 (ER 403). Both appear in our state rules of evidence underneath the title "Relevancy and Its Limits." Counsel's objection that the evidence was not relevant was sufficient to preserve this issue; the basis for the objection is both clear from the record and sufficient for this court's review.

The State failed to demonstrate a "reasonable and substantive inference" between Talbott's actions and consciousness of guilt. Though Talbott initially refused to provide identification and failed to immediately turn around and put his hands behind his back,[3] Talbott did not flee and complied with commands after Scharf moved to physically engage him. Further, the significant passage of time between the murders and Talbott's arrest undercuts any relevance with regard to consciousness of guilt. In *McDaniel*, the court held evidence that a defendant resisted an arrest which took place nine months after the crimes had occurred made any inference as to consciousness of guilt too speculative. 155 Wn. App. at 855. Here, Talbott was arrested 30 years after the crimes took place. There is so little probative value in the evidence of Talbott's arrest that the court abused its discretion in admitting the testimony.

---

[3] Scharf testified that, upon approaching Talbott at his place of employment, he had identified himself as "Detective Scharf from the Sheriff's Office, but [] didn't tell him which sheriff's office," nor did he explain the reason for his contact prior to asking for Talbott's identification. This context is significant in light of the State's argument that Talbott's initial noncompliance demonstrated consciousness of guilt.

However, an evidentiary error only requires reversal where, within reasonable probabilities, it materially affected the outcome of the trial. *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001). Because the probative value of the testimony was so low, the likelihood that it affected the outcome of the trial is also low. Talbott failed to meet his burden to demonstrate prejudice given that his conduct as described by Scharf was innocuous to the point that it was not relevant, which renders it unlikely to have materially affected the outcome of the trial.

V.      Prosecutorial Misconduct

Talbott asserts that repeated prosecutorial misconduct during closing argument and rebuttal deprived him of a fair trial. A prosecutor is required to "seek convictions based only on probative evidence and sound reason." *State v. Castañeda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991). The State "'should not use arguments calculated to inflame the passions or prejudices of the jury.'" *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (quoting AM. BAR ASS'N, STANDARDS FOR CRIMINAL JUSTICE std. 3-5.8(c) (2d ed. 1980)). While the prosecutor has "wide latitude to argue reasonable inferences from the evidence, it is misconduct for a prosecutor to urge the jury to decide a case based on evidence outside the record." *State v. Teas*, 10 Wn. App. 2d 111, 126, 447 P.3d 606 (2019). It is also misconduct for a prosecutor to suggest a defendant has a duty to present evidence or otherwise shift "the State's burden to prove guilt beyond a reasonable doubt." *State v. Osman*, 192 Wn. App. 355, 366, 366 P.3d 956 (2016). "However, a prosecutor is entitled to point out the improbability or lack of evidentiary support for the defense theory of the case." *Id.* at 367. A prosecutor

may not take any "action which will unnecessarily 'chill' or penalize the assertion of a constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right." *State v. Rupe*, 101 Wn.2d 664, 705, 683 P.2d 571 (1984) (quoting *United States v. Jackson*, 390 U.S. 570, 581, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968)).

Talbott assigns error to a number of remarks by the State. First, he challenges the prosecutor's statements at the beginning of closing argument that asked the jury what Van Cuylenborg and Cook's lives might have looked like had they not died. He further argues this misconduct was repeated on rebuttal, where the prosecutor asserted the decision the jury made would have a significant impact on the lives of the defendant, the victims' families, and the victims' friends. Talbott contends these arguments were made solely to trigger an emotional response and appeal to the sympathy of the jurors. Talbott next challenges the prosecutor's reference to the AIDS[4] epidemic in the 1980s as not based on evidence contained within the trial record. Talbott finally avers the prosecutor made several statements that shifted the burden of proof, and improperly commented on Talbott's exercise of his rights to silence and to present a defense.

A.    Preservation

In a prosecutorial misconduct claim, the burden is on the defendant to establish that the challenged conduct was improper and prejudicial in the context of the entire record. *State v. Thorgerson*, 172 Wn.2d 438, 442-43, 258 P.3d 43 (2011). To demonstrate prejudice, Talbott must show that there exists a

---

[4] Acquired immunodeficiency syndrome.

substantial likelihood that the misconduct affected the jury's verdict. *Id.* "Defense counsel's failure to object to the misconduct at trial constitutes waiver on appeal unless the misconduct is 'so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice' incurable by a jury instruction." *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (internal quotation marks omitted) (quoting *State v. Gregory*, 158 Wn.2d 759, 841, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014)).

While Talbott concedes that he did not make contemporaneous objections to many of the arguments he now challenges on appeal, he avers that defense counsel's postverdict motion for a new trial under CrR 7.5, based in part on those statements, preserved the errors for appellate review. However, defense counsel did timely object to the prosecutor's comment that the jury's decision would significantly impact the friends and family of the victims on the basis that it was not rebuttal. Talbott did not challenge the prosecutor's comment about the AIDS epidemic in his CrR 7.5 motion.

Talbott cites *State v. Lindsay* to argue a contemporaneous objection is not the only way to preserve an issue for the lower standard on review, the analysis does apply here. 180 Wn.2d 423, 430-31, 326 P.3d 125 (2014). In *Lindsay*, our Supreme Court determined that the defense motion for mistrial directly following the prosecutor's closing argument, but prior to deliberation, had the same functional effect as a contemporaneous objection. *Id.* at 430-31. However, the trial court in *Lindsay* still had an opportunity to cure via instruction. *See Id.* Talbott's motion for arrest from judgment and a new trial under CrR 7.4 and 7.5 is

distinct from an objection at trial or a motion prior to the jury's deliberation in that it was brought postverdict, and provided the trial court no opportunity to give a curative instruction before the jury determined its verdict.

Accordingly, only the prosecutor's comment during rebuttal closing, that the jury's decision would significantly impact the friends and family of the victims, was preserved such that the lower standard of review applies.

B.      Specific Claims of Prosecutorial Misconduct

"Defendants are among the people the prosecutor represents.      The prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated."  *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011).   Having determined which test applies for each instance of alleged prosecutorial misconduct, we now turn to Talbott's specific challenges to determine if he is entitled to appellate relief on these bases.

i.      Impact of Verdict on Friends and Family of Victims

The only comment by the State to which Talbott contemporaneously objected was the prosecutor stating to the jury that

> you are all experienced and intelligent enough to know that the decision you are about to make will have a significant impact on people's lives. On Mr. Talbott's life. On his friends and family. On the lives of the friends and family of Tanya Van Cuylenborg and Jay Cook, who have been waiting for justice for 30-something years. You know this.

Defense counsel objected that the statement was "not rebuttal."   The trial court agreed, but stated, "I'm going to allow a little leeway here."   This argument worked to appeal to the emotions of the jurors, rather than reminding them of their duty to

weigh the evidence and the law and come to a logical conclusion as to the State's burden. However, Talbott fails to establish prejudice from this argument as the members of the jury were surely aware that their deliberation and verdict would have an impact on the lives of the numerous parties involved in this case.

ii.      Speculating on Victims' Hypothetical Futures

The prosecutor began his closing argument by asking the jury to imagine what the lives of Van Cuylenborg and Cook would have been like had the crimes not occurred:

> Tanya was 18, and Jay was 20 in November of 1987. Today, Tanya would be 50, Jay would be 52. What would their lives have looked like?
> At this young age, all of life's important decisions were still in front of them. Would they go to college? Or University? They were Canadian, after all. What would they choose as a career? What friends would they make along the way? Would they travel the world? Would they marry? Would they have children? If so, how many? Boys? Girls? These are all questions that their family and friends have asked more than once in the softer moments. But there are also questions that they have asked over and over again over the past 31 years, questions that frame their grief and loss.

This argument improperly appealed to the jury's passion and prejudice in addition to inviting the jury to speculate on evidence outside the record. *See State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1168 (2012). However, any prejudice could have been cured by an instruction from the court in response to a timely objection by the defense. The court instructed the jury that "the lawyers' statements are not evidence," and they "must disregard any remark, statement, or argument that is not supported by the evidence or the law." The jury was also instructed to "not let your emotions overcome your rational thought process," and

instead to "reach your decision based on the facts proved to you and on the law given to you." A curative instruction from the court would have adequately addressed any prejudice from the prosecutor's improper comment.

### iii. Reference to AIDS Crisis

Talbott also points this court to the prosecutor's reference to the impact of AIDS and, in particular, fear around the disease which was prevalent in the 1980s:

> We also know, this is 1987. And the presence of semen would suggest, especially on her vaginal swab, that this sexual encounter occurred without a condom. At the height of the AIDS crisis in 1987. Under what circumstances, again, how plausible is it that she would have a consensual sexual encounter with a stranger that night under those circumstances?

This comment plainly refers to facts outside of the evidence. There was no evidence presented during trial regarding the AIDS crisis generally, or any evidence that Van Cuylenborg was fearful of HIV[5] or AIDS, or that the global health crisis surrounding the virus impacted her sexual decision-making. However, any prejudice could have been cured by an instruction or admonition by the court, reminding the jury it could only consider the evidence presented and to disregard the prosecutor's reference to matters outside the record.

### iv. Burden Shifting and Evidence of Consent

Talbott argues the prosecutor improperly shifted the burden of proof when he commented that there was no evidence of a consensual sexual encounter. The prosecutor argued:

> [Defense counsel] mentioned again and again in her closing

---

[5] Human immunodeficiency virus. If left untreated, HIV can lead to the development of AIDS.

argument this innocent explanation, this innocent alternative explanation for why Mr. Talbott's DNA, his semen, would be on Tanya. Where is it? What is it? Have you heard it? Because there is no evidence of anything but rape. To suggest, again, that there was a consensual encounter between the defendant and Tanya runs contrary to all of the evidence.

The prosecutor reinforced this by stating, "There is simply no evidence to suggest a consensual sexual encounter."

Again, the accused "has no duty to present evidence, and it is error for the prosecutor to suggest otherwise." *Osman*, 192 Wn. App. at 366. A prosecutor's actions constitute misconduct where they "shift[] the State's burden to prove guilt beyond a reasonable doubt." *Id.* Generally, the prosecutor may not "'comment on the lack of defense evidence because the defense has no duty to present evidence.'" *State v. Fedoruk*, 184 Wn. App. 866, 887, 339 P.3d 233 (2014) (quoting *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003)). A prosecutor may, however, "point out the improbability" of the defense's theory of the case, *Osman*, 192 Wn. App. at 367, or "argue that the evidence does not support the defense theory." *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994).

The prosecutor's comments here respond to defense counsel's argument that "there is an innocent explanation for [Talbott's] DNA," and "there are innocent explanations to why that DNA is present on [Van Cuylenborg], associated with [Van Cuylenborg]." Considering the evidence and closing arguments as a whole, the prosecutor's comments on this issue are directed at undercutting the explanation provided in Talbott's closing argument which purported to demonstrate consensual sexual activity. More critically, even if the statements were improper,

an instruction from the court as to the State's burden of proof could have cured any prejudice.

v.    Comment on Cross-Examination of Print Analyst

Finally, the prosecutor questioned why Talbott would cross-examine the fingerprint analyst at length during the presentation of evidence if the sexual encounter with Van Cuylenborg had indeed been consensual.  The prosecutor stated:

> That the defense responds, both in the course of the trial and in closing argument, to the fingerprint or palm print evidence is interesting. Because if the theory that the defense wants you to accept is that at some point, under some circumstances, beyond comprehension, Mr. Talbott and [Van Cuylenborg] met and had a consensual sexual encounter, then why are we so worried about his palm print on the van? If there is this innocent alternative explanation for why his semen is here, which again, we haven't heard, then why are we so worried about the palm print? Why expend so much energy attacking the witness on the stand, and trying to discredit the evidence in closing argument if it's just part of this innocent alternative explanation for their encounter?

This argument by the State was an improper comment on Talbott's constitutional right to confront and cross-examine witnesses.  *See Rupe*, 101 Wn.2d at 705 ("[T]he State may not draw adverse inferences from the exercise of a constitutional right.").  Offering an innocent explanation for certain evidence is not a waiver of the right to vigorously challenge the State's witnesses and evidence.  "Cross-examination is the principal means by which the believability of a witness and the truth of [their] testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).  The confrontation of witnesses "'helps assure the accuracy of the fact-finding process.'" *State v. Chicas Carballo*,

17 Wn. App. 2d 337, 346, 486 P.3d 142 (2021) (quoting *State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002)). This misconduct by the State, however, could have been cured by an instruction from the court which directed the jury to disregard the comment and reminded jurors that they may not draw an adverse conclusion from Talbott's exercise of his constitutional rights.

Ultimately, Talbott fails to meet his heightened burden of demonstrating that the prosecutor's improper conduct in closing argument had a substantial likelihood of affecting the verdict and that such prejudice could not have been cured with an instruction had counsel timely objected.[6] *State v. Emery*, 174 Wn.2d 741, 760-761, 278 P.3d 653 (2012). However, we take this opportunity to remind the State of its duty to the accused under the law to refrain from improper arguments. A prosecutor is "the representative of the people in a quasijudicial capacity in a search for justice," and as such "owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated." *Monday*, 171 Wn.2d at 676.

VI.    Ineffective Assistance of Counsel

In a related assignment of error, Talbott asserts counsel was ineffective for failing to object to those comments he identifies as prosecutorial misconduct. In a claim of ineffective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient and that the deficient performance resulted

---

[6] Talbott also argues that the cumulative effect of the prosecutor's improper comments in closing and rebuttal argument "incurably prejudiced the jury." "[T]he cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect." *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011), *adhered to on recons.,* 173 Wn. App. 1027 (2013). Here, just as the improper comments were not prejudicial individually, they were not so repetitive or flagrant as to have caused incurable prejudice collectively. Rather, any initial prejudice that may have resulted could have been cured by jury instructions.

in prejudice. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Performance is considered deficient if it falls "below an objective standard of reasonableness based on the consideration of all the circumstances." *McFarland*, 127 Wn.2d. at 334-35. "Specifically, 'the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (quoting *McFarland*, 127 Wn.2d at 336). Trial counsel's decision about when, and how, to object is a "classic example of trial tactics." *Id*. The defendant must demonstrate that, had counsel made the proposed objection, it would have succeeded. *Id.* A showing of prejudice requires a reasonable "probability that, 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "Courts engage in a strong presumption counsel's representation was effective." *McFarland*, 127 Wn.2d at 335.

Here, counsel affirmatively stated the decision not to object was a strategic one. In Talbott's postverdict motion for a new trial, defense counsel explained that he "was faced with a Hobson's choice of risking alienation of the [jury] by objecting," particularly where the court had given wide latitude to the prosecutor and, as such, did not object to other instances of misconduct.[7] The decision to forego an objection due to the risk of it being overruled, therefore calling further

---

[7] For example, the court agreed the prosecutor's argument that the jury's decision would impact the victims' family and friends was "not technically rebuttal" but had expressly ruled to "allow a little leeway" to the prosecutor.

- 25 -

attention to the matter at the heart of the objection, is a classic strategic choice. Given the risk of alienating the jury, the choice not to object during closing and then pursue relief through a postverdict motion, while unsuccessful, was a reasonable tactical decision. Because he fails to demonstrate deficient performance, Talbott has not met his burden under *Strickland* to establish ineffective assistance of counsel.

VII.    Firearm Enhancement

Talbott next asserts the trial court erroneously included a firearm enhancement in the sentence it imposed, as recorded in the judgment and sentence. The jury found Talbott was armed with a firearm during the commission of the crimes. However, a firearm enhancement only applies to "felony crimes committed after July 23, 1995." RCW 9.94A.533(3). The jury expressly found both crimes were committed in November 1987. Accordingly, the statutory firearm enhancement does not apply to the crimes at issue here as a matter of law. The State properly concedes this was error. We remand for the trial court to strike the firearm enhancement and correct the judgment and sentence.

VIII.   Youthfulness

In supplemental briefing, Talbott contends he is entitled to a new sentencing hearing so the judge may consider his youthfulness[8] under *In re Personal Restraint of Monschke*, 197 Wn.2d 305, 482 P.3d 276 (2021). In *Monschke*, our State Supreme Court held mandatory sentences of life without the possibility of parole

---

[8] Talbott was 24 years old at the time the crimes were committed.

are unconstitutional when imposed on youthful offenders because sentencing courts must retain discretion to consider the mitigating qualifies of youth. 197 Wn.2d at 325-26. However, *Monschke* dealt with 19- and 20-year-old defendants; the Supreme Court has not extended its application to include individuals up to 24 years of age, like Talbott was. As an intermediate appellate court, we decline to extend the temporal bounds of our Supreme Court's holding from *Monschke* to include 24-year-olds.

IX.     Cumulative Error

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. However, "[t]hat doctrine applies only if there were several trial errors, none of which standing alone is sufficient to warrant reversal, that when combined may have denied the defendant a fair trial." *State v. Hartzell*, 156 Wn. App. 918, 948, 237 P.3d 928 (2010).

Talbott claims that the cumulative error doctrine applies because "multiple errors occurred at his trial." We have identified three errors in our review of Talbott's case. While we note Scharf's improper testimony where he told his sergeant "the case was solved," that error was not preserved based on the lack of objection and failure to establish manifest constitutional error under RAP 2.5(a)(3), based largely on the fact that defense counsel strategically utilized this testimony which supported Talbott's theory of the case. We next concluded that the trial court erred in allowing Scharf's prolonged description of Talbott's arrest, however that error was not only harmless, but also "innocuous to the point that it was not

- 27 -

relevant." Finally, we identified improper comments by the State in closing argument, however, the sole claim of prosecutorial misconduct that was not waived was based on the prosecutor's comment to the jury regarding the impact that the verdict would have on the friends and family of the victims. While this statement was an improper appeal to the jurors' emotions, Talbott failed to establish any prejudice and we plainly noted that the jurors were already aware of the practical implications of any verdict they reached.

Accordingly, we only consider the impact of two preserved harmless errors under the framework of cumulative error; Scharf's testimony concerning Talbott's arrest and the prosecutor's comment regarding the significant impact of the verdict. Even when combined, these errors were not so significant as to result in a fundamentally unfair trial. With the two harmless errors at issue here, the cumulative error doctrine is simply inapplicable. *See State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006) ("The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial."). On this record, Talbott fails to establish that these errors "produced[d] a trial that was fundamentally unfair." *Emery*, 174 Wn.2d at 766.

X.      Statement of Additional Grounds for Review

Talbott raises a variety of issues in his pro se statement of additional grounds for review (SAG). Under RAP 10.10(a), a defendant may file an additional brief "and discuss those matters related to the decision under review that the defendant believes have not been adequately addressed by the brief filed by the defendant's counsel." We will "only consider arguments that are not repetitive of

briefing." *State v. Calvin*, 176 Wn. App. 1, 26, 316 P.3d 496 (2013). A defendant may not raise "issues that involve facts or evidence not in the record" in a SAG, but must raise those issues in a personal restraint petition. *Id.* While "[r]eference to the record and citation to authorities are not necessary or required," a defendant must "inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). We decline to reach Talbott's argument regarding incomplete or inaccurate verbatim reports of proceedings as it references evidence not in the record. We also decline to reach Talbott's pro se assignment of error regarding the insufficiency of evidence as repetitive of his counsel's briefing already analyzed herein.

Talbott argues there was additional evidence of other suspects that should have led to investigation pretrial and testimony at trial. The legal nature of this assignment of error is ambiguous; it is not clear if Talbott is asserting the prosecutor committed misconduct by arguing that "tips were ruthlessly followed up on" and that "[p]rints from the van were also compared to persons of interest over the years" in light of Talbott's assertion in his SAG that there were other suspects whose prints were not compared to those on the van and other tips that were not investigated, or if he is arguing defense counsel was ineffective for failing to point out these purported contradictions. As we are unable to discern the nature and occurrence of the alleged error from Talbott's SAG, we do not consider this challenge.

Talbott also argues his trial counsel was ineffective for failing to obtain employment records for State's witness Tim McPhearson and security camera

footage of his arrest, not adequately cross-examining witnesses, and failing to object to prosecutorial misconduct. Talbott does not explain how McPhearson's employment records would have been used at trial or how they would have undercut McPhearson's testimony, which was, in turn, a small portion of the lengthy trial. To the extent Talbott references facts outside the record to support this assignment of error, we may not reach that challenge. *See Calvin*, 176 Wn. App. at 26-27. As to the arrest footage, defense counsel's decision to not obtain or seek admission of arrest footage was a reasonable strategic decision given that counsel sought to exclude Scharf's testimony about Talbott's arrest as irrelevant.

Talbott also contends counsel was ineffective for failing to question forensic analyst Lisa Collins about another source of DNA found on Van Cuylenborg and failing to argue that Van Cuylenborg had another recent sexual encounter which produced the second DNA profile. However, the record represents that his defense attorney cross-examined Collins on the second DNA profile and elicited testimony that the profile was consistent with bodily fluids such as saliva or vaginal secretions. As such, counsel's performance was not deficient.

Talbott next alleges counsel was ineffective for failing to object to the prosecutor's misconduct, namely the State's use of the word "rape" over 25 times in closing argument and the prosecutor's final words in rebuttal that "Mr. Talbott bound raped, then killed Tanya Van Cuylenborg." As to the repetition of the word rape, this was proper argument and counsel's performance was therefore not deficient for failing to object. Talbott's challenge to the prosecutor's final words relies on facts outside the record and as such we may not consider it. *See Id*.

Talbott finally contends prosecutorial misconduct warrants reversal in this case. He again challenges the prosecutor's repeated use of the word "rape" and the prosecutor's final words in rebuttal, which he recalls as "Mr. Talbott bound raped, then killed Tanya Van Cuylenborg." Talbott does not argue that the number of times the word rape was used was misconduct, but that since "there were no charges of rape or forensic evidence of rape," use of the word was improper. While there was no separate charge of rape filed by the State, an aggravating circumstance based on rape was alleged in the charging document and presented to the jury. The State's theory of the case was that Talbott raped Van Cuylenborg and then killed her and Cook to cover up the rape. As such, the use of the word "rape" was proper as it was a key aspect of the State's theory of the case and evidence presented at trial. Again, Talbott's argument regarding the prosecutor's final words relies on facts outside the record and as such we may not consider it. *See Id*.

We remand for the trial court to strike the firearm enhancement from Talbott's judgment and sentence, but otherwise affirm.[9]

WE CONCUR:

Díaz, J.

---

[9] After Talbott's case was remanded to this court, he moved to file a supplemental opening brief, raising additional issues. This court granted his motion and authorized the State to file a response, which it did. Talbott then filed a reply brief. We exercise our discretion to not reach the supplemental assignments of error and decline to consider these additional issues.