# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60300-4-II |
| Respondent, | |
| v. | |
| MALEKE DOMINQUE PATE, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J.—Maleke Pate appeals his four convictions for aggravated first degree murder, arguing that the prosecutor committed misconduct in rebuttal closing argument because she (1) shifted the burden of proof to Pate, (2) misstated evidence, and (3) vouched for the credibility of State witnesses. In the alternative, Pate argues that the trial court erred at sentencing by concluding that it did not have discretion under *Monschke*[1] to impose a sentence below the standard range because Pate was 22 years old at the time of the offense.

We conclude that the prosecutor did not commit misconduct because she (1) did not shift the burden of proof to the defendant by pointing out the lack of evidence supporting the defense theory, (2) did not materially misstate the evidence regarding the color of clothing worn by the killer and Pate fails to demonstrate that any improper conduct was prejudicial, and (3) did not vouch for witness credibility based on personal knowledge but instead argued a reasonable

---

[1] *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 482 P.3d 276 (2021).

inference from the testimony elicited at trial. And we conclude that the trial court did not err by sentencing Pate to mandatory life without parole because *Monschke*'s holding does not apply to offenders over twenty years old. Accordingly, we affirm.

FACTS

I. BACKGROUND AND TRIAL TESTIMONY

Four people were shot and killed behind a house where one of them lived. Following an investigation, the State charged Maleke Pate with four counts of first degree murder.

At trial, the State's witnesses testified as follows. Danielle Monesmith lived at the house and witnessed the incident from inside. When Monesmith called 911 shortly after the incident, she described the shooter as wearing a white tank top. In a police interview later that day, Monesmith said the shooter was tall, athletic, wearing a white tank top, jeans, a chain necklace, and a durag but she was not sure what color the durag was. At trial, she described the shooter as "taller, slender, athletic build. He was [B]lack. He was wearing a durag and a tank top." 4 Verbatim Rep. of Proc. (VRP) at 417.

Two neighbors, Gena Colleran and Franklin Brogan, also directly observed parts of the incident. At trial, Colleran could only recall that the shooter was wearing a durag. Colleran told law enforcement that the shooter was " 'a [B]lack male in his 20s wearing a dark blue or black long basketball-style shorts, dark shoes, [black tank] top with a black durag on his head.' " 6 VRP at 668.

Brogan testified at trial that the shooter was an "African American" man in his "[e]arly to mid-twenties" wearing a durag and a black tank top. 5 VRP at 556. Brogan could not recall whether the durag was black or blue. On the day of the incident, Brogan told the police the durag was blue.

On cross-examination of Brogan and Colleran, defense counsel elicited testimony that Brogan, Colleran, and Monesmith sat together in the hallway prior to testifying. Colleran stated that she did not discuss the case with Monesmith and spoke to Brogan only about the way the case made them feel, but not anything they recalled happening. Brogan testified that he and the other witnesses "briefly discussed some of" the case. *Id.* at 566.

As part of the investigation, law enforcement canvassed the surrounding area for any video or audio recordings that may have captured the shooter or the incident. Law enforcement collected several videos of a Black man in his early to mid-twenties wearing a black tank top, blue durag, blue basketball shorts, and black tennis shoes with white bottoms. The man was running away from the scene in the moments following the incident while clutching an object to his right side. None of the videos recorded the incident itself. Videos showed the same man walking a brown dog earlier that day.

Based on the images in the videos and additional investigation, law enforcement secured a warrant to search Maleke Pate's residence. In Pate's bedroom, law enforcement found Pate's wallet and all the clothes worn by the man in the videos: white earphones, a blue durag, black shoes with white soles, a black tank top, and blue shorts with a camouflage design on the side. And law enforcement found a 9mm semiautomatic handgun in a suitcase with a bag tag with Pate's name on it. The handgun did not have a serial number on it.

A firearm and toolmark examiner determined that the casings recovered from the scene were fired from the semiautomatic handgun found in Pate's suitcase. On cross-examination, defense counsel elicited testimony that the results of firearms testing are not always "100 percent accurate." 11 VRP at 1368.

While awaiting trial, Pate made two phone calls to his mom from jail that were admitted at trial. In the calls, Pate did not deny that the gun found in his suitcase was the murder weapon but said that it had no fingerprints on it and that it was not his. Pate told his mom that he told his lawyers that although the murder weapon was in his house, there was no proof that it was his. Pate and his mother had the following exchange:

> [Pate]: I said they have a – I said you guys have a murder weapon in the house that me and my mom lived in. Uh...
>
> A: That doesn't mean - that doesn't mean that we did it.
>
> [Pate]: That's what I told them. Well listen - listen to what I told them. . . . I said my mom's a whore and - and doesn't know who's in and out of the house because whoever's in there gets her high. That's what I told them.
>
> A: You told them what?
>
> [Pate]: I said - I said my mom's a whore and doesn't know who's in and out of the house because they get her high.
>
> A: What? Oh, my God.
>
> [Pate]: What?
>
> A: Mm, mm, mm.

Ex. 415 at 4.

## II. CLOSING ARGUMENTS

In closing, Pate argued that the witnesses who observed the incident were not credible because they discussed the case in the hallway prior to their testimony. Defense counsel emphasized that the witnesses' descriptions of the shooter to law enforcement, as well as their descriptions of the shooter at trial, were inconsistent with one another. Defense counsel did not argue that the man in the videos was not Pate. In fact, defense counsel acknowledged that the man

in the videos "looks . . . like our guy." 11 VRP at 1440. Instead, Defense counsel's theory was that even if the man in the videos was Pate, it is possible that he was just running away from the sound of shooting for his own safety.

In the State's rebuttal argument, the prosecutor argued that defense counsel's theory that Pate ran away from the scene because he was afraid but was not the shooter was unlikely. The prosecutor argued:

> Is it possible that he just happened to be in the area and that he was afraid and he was fleeing?
>
> For that to be true, to take that argument to its logical conclusion, you also have to find there must also have been a real killer in that area in that time in that space on that date who was a [B]lack male in his 20s, who also happened to be wearing a blue durag, who also happened to be wearing a black tank top, who also happened to be wearing a blue basketball shorts with [a] design along the seams.
>
> And the reason I say this is because Gena Colleran and Frank Brogan, the description they gave to the police -- Ms. Colleran, she couldn't even remember what she told the police, but the description that she gave to the police when she was interviewed on that day, the day of the incident when her memory was most fresh, that's the description that she gave. The killer wearing a blue durag, a black tank top, [and] blue basketball shorts.

*Id.* at 1447-48. Then defense counsel objected to "[f]acts not in evidence." *Id.* The objection was overruled.

Later, in response to defense counsel's argument that the State did not address whether other people lived at Pate's residence, the prosecutor argued, "What does it matter? In that room there wasn't another wallet with somebody else's face and someone else's name. There wasn't a photo of some other guy other than Maleke Pate. There wasn't evidence of some other guy who looks just like Maleke Pate staying in that room." *Id.* at 1457. Defense counsel objected, "[b]urden shifting." *Id.* The objection was overruled.

5

The prosecutor went on to argue "you weren't asked to leave your common sense at home. In fact, you're supposed to use common sense and your life experience." *Id.* at 1450. The prosecutor then read from the jury instruction 4, " 'Based on your common sense and experience, you may reasonably infer something that is at issue in this case.' " *Id.* Counsel objected, "Minimizing the burden." *Id.* The trial court overruled the objection, clarifying for the jury "this is argument. And the evidence is the evidence that was presented to you in the courtroom and the law is in my instructions. This is argument as is instructed in the jury instructions." *Id.* The jury instructions stated, "the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions." Clerk's Papers (CP) at 259.

The prosecutor continued,

Ladies and gentlemen, using your logic and common sense, do you believe that there is a guy who looks exactly like Maleke Pate who happens to be Maleke Pate's doppelganger who happened to be in that area at that time in that space who was wearing the clothes that Maleke Pate was wearing, the black tank top, the blue basketball shorts, the black and white tennis shoes, the blue durag. His doppelganger not only was wearing his clothes, but his doppelganger was living in his house, was sharing his bedroom, was wearing his clothes, and then was hiding the murder weapon in Maleke Pate's suitcase, next to Maleke Pate's revolver next to Maleke Pate's ammunition next to Maleke Pate's magazines. No.

11 VRP at 1451. Defense counsel did not object to this argument.

In response to defense counsel's argument that the jury should doubt whether the gun in Pate's suitcase was the murder weapon because there was no DNA on the gun, the prosecutor argued

So what? Is there [a] dispute that that gun, . . . that you saw in this courtroom, the gun that you heard testimony about, that that gun is not the murder weapon? Maleke

> Pate's on the phone with his mom. He doesn't say, Hey, I don't know what they're talking about, that can't be the murder weapon. No.

*Id.* at 1453. Defense counsel objected, "[b]urden shifting." *Id.* The trial court overruled the objection.

Then, the prosecutor addressed defense counsel's argument that the witnesses' testimony could not be trusted because they briefly discussed the case prior to testifying. The prosecutor argued, "Well, ladies and gentleman, we don't know what they discussed. But you know what? We know one thing. They didn't do this: Hey, what are you going to say? I said he had on a black T-shirt." *Id.* at 1459. Defense counsel objected, "[v]ouching." *Id.* The trial court overruled the objection. The prosecutor nonetheless rephrased her argument, explaining that the jury could infer that the witnesses did not coordinate their testimony because each of them described the shooter slightly differently.

The jury found Pate guilty of all four counts of aggravated first degree murder, each with a firearm enhancement.

### III. SENTENCING

At sentencing, Pate requested an exceptional sentence based on Pate's youth at the time of the offense. Pate argued that our supreme court's holding in *Monschke*, that sentencing courts must consider the mitigating qualities of youth, applied to Pate. Pate was 22 years old at the time of the murders.

The trial court sentenced Pate to four consecutive life sentences without the possibility of parole. The trial court reasoned that RCW 10.95.030 does not provide the court with discretion to deviate from a sentence of life without parole. After considering our supreme court's holding in *Monschke*, the trial court found "that the law in its current state does not provide this Court with

7

discretion to deviate from a sentence of life without the possibility of parole because Mr. Pate was 22 at the time of these crimes. *Monschke* relates to persons between 18 and 20 years old." 15 VRP at 80. The trial court went on to say that even if *Monschke* did apply, Pate's youth did not mitigate his culpability. The trial court stated, "These crimes were the opposite of impulsive. They were carried out with calculation and planning. They were deliberate, intentional[ly] perpetrated for reasons which we will likely never understand. They were cruel beyond any words that I can use in this sentencing today." *Id.* at 81.

The trial court emphasized that Pate "was an adult. He was successful in his employment, father to a young child, a gun owner who used his weapons regularly." *Id.* at 82. The court concluded, "[t]here is simply nothing in the record that is before this Court to indicate that Mr. Pate was anything other than a functioning individual living his life as usual, other than that he had committed four horrific murders." *Id.* at 83.

Pate appeals.

## DISCUSSION

### I. PROSECUTORIAL MISCONDUCT

Pate argues that the prosecutor committed misconduct by shifting the burden of proof to Pate, (2) misstating the evidence, and (3) vouching for the credibility of State witnesses. We disagree. The prosecutor's conduct was not improper.

*A. Legal Principles*

Prosecutorial misconduct may deprive a defendant of their constitutional right to a fair trial. *State v. Davenport*, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). In such a claim, the defendant must show (1) that the prosecutor made improper comments and (2) that the comments were

prejudicial. *State v. Emery*, 174 Wn.2d 741, 759-60, 278 P.3d 653 (2012). Prejudicial comments are those with a substantial likelihood of affecting the verdict. *Id.* at 760. We review a prosecutor's comments during closing argument in the context of the entire case. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011).

Where a defendant fails to object at trial, the errors complained of are waived unless the defendant establishes that the misconduct was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. To do so, a defendant must show that (1) the conduct of the prosecutor was flagrant and ill-intentioned and (2) no curative instruction would have obviated any prejudicial effect of the misconduct. *Id.* If a defendant makes both of these showings and overcomes waiver, the defendant must then demonstrate there is a substantial likelihood that the misconduct affected the jury's verdict in order to obtain reversal. *State v. Gouley*, 19 Wn. App. 2d 185, 201, 494 P.3d 458 (2021). In determining waiver, our primary focus is on whether the prejudice caused by misconduct could have been cured. *Emery*, 174 Wn.2d at 762. When a defendant fails to show that the improper remarks were incurable, the claim is waived "and our analysis need go no further." *Id.* at 764.

Although prosecutors have "wide latitude to argue reasonable inferences from the evidence," they may not shift the burden of proof to the defense or comment on the defendant's failure to present evidence. *Thorgerson*, 172 Wn.2d at 453. Prosecutors are permitted to characterize the facts presented and argue reasonable inferences from those facts during closing argument. *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 167, 410 P.3d 1142 (2018). Moreover, jurors are "specifically instructed not to consider closing arguments as evidence, which further helps draw the line between fact and argument." *Id.* However, prosecutors may not express

9

personal beliefs regarding "the veracity of a witness," nor may they suggest that evidence outside of the record supports certain testimony. *Thorgerson*, 172 Wn.2d at 443. "Whether a witness testifies truthfully is an issue entirely within the province of the trier of fact." *Id.*

The supreme court has explained the distinction between the prosecutor expressing a personal opinion and the prosecutor asking the jury to draw a reasonable inference from the evidence:

> "It is not uncommon for statements to be made in final arguments which, standing alone, sound like an expression of personal opinion. However, when judged in the light of the total argument, the issues in the case, the evidence discussed during the argument, and the court's instructions, it is usually apparent that counsel is trying to convince the jury of certain ultimate facts and conclusions to be drawn from the evidence. Prejudicial error does not occur until such time as it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion."

*State v. McKenzie*, 157 Wn.2d 44, 53-54, 134 P.3d 221 (2006) (emphasis omitted) (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)).

*B. Burden of Proof*

First, Pate argues that the prosecutor repeatedly shifted the burden of proof to the defendant when she commented on the lack of evidence supporting the defendant's theory of the case.

Criminal defendants have no duty to present exonerating evidence, and a prosecutor errs when she suggests otherwise. *State v. Osman*, 192 Wn. App. 355, 366, 366 P.3d 956 (2016). That said, a "prosecutor has wide latitude to comment on the evidence introduced at trial and to draw reasonable inferences from the evidence." *Id.* at 367. And "a prosecutor is entitled to point out the improbability or lack of evidentiary support for the defense theory of the case." *Id.*

Pate asserts that the prosecutor shifted the burden of proof by arguing that, for the defendant's theory that Pate was in the area, heard the gunshots, and ran away but was not the

killer to be true, the jury would need to find that Pate had a " 'doppelganger' " who was " 'the real killer.' " Br. of Appellant at 20 (quoting VRP at 1449, 1451). Pate did not object to this remark at trial. This comment, made in direct response to Pate's theory presented in closing arguments, was not improper. The prosecutor did not imply that Pate had any responsibility to present exonerating evidence but instead emphasized that the evidence presented at trial did not support Pate's theory of the case. Even if this comment were improper, Pate does not demonstrate that a curative instruction could not have obviated the prejudicial effect of the misconduct. This claim is waived.

Next, Pate argues that the prosecutor shifted the burden of proof by highlighting that when discussing the gun in a jail phone call with his mother, Pate did not deny that the gun was his. In context, this argument did not imply that Pate had a responsibility to demonstrate his innocence by denying that the gun was the murder weapon. Instead, the prosecutor argued a reasonable inference from the evidence admitted at trial. Pate's own statements made on the jail phone call were evidence the prosecutor was entitled to discuss. This argument was not improper.

Next, Pate argues that the prosecutor shifted the burden of proof by emphasizing the lack of evidence supporting Pate's theory that the gun could have belonged to someone else in the house. Specifically, Pate argues that the State improperly argued " 'In that room there wasn't another wallet with somebody else's face and someone else's name. There wasn't a photo of some other guy other than Maleke Pate. There wasn't evidence of some other guy who looks just like Maleke Pate staying in that room.' " Br. of Appellant at 23 (emphasis omitted) (quoting 11 VRP at 1457). Here, the prosecutor's remark emphasized that the evidence presented at trial supported the reasonable inference that the gun was Pate's because nobody else lived in that room. This argument was not improper.

Pate contends that these arguments by the prosecutor presented the jury with false choices. A prosecutor commits misconduct when they present jurors with a false choice that they can only find the defendant not guilty if they find the State's witnesses were lying. *State v. Wood*, 19 Wn. App. 2d 743, 772-73, 498 P.3d 968 (2021). As discussed above, the challenged remarks merely invited the jury to draw reasonable inferences from the evidence actually admitted at trial. The inferences or "choices" that the prosecutor invited that jury to make were directed at specific arguments in Pate's closing statement, rather than the ultimate question of Pate's guilt. These arguments were proper.

Next, Pate argues that the prosecutor misstated the burden of proof when she repeatedly told the jury that they could rely on " 'logic and common sense' " to make reasonable inferences about the case. Br. of Appellant at 21 (quoting 11 VRP at 1451). This argument directly referenced jury instruction 4, which states, " 'circumstantial evidence' refers to evidence from which, based on your common sense and experience, you may reasonably infer something that is at issue in this case." CP at 263. Because the prosecutor's remark accurately referred to the jury instruction and Pate does not challenge the jury instruction, the prosecutor's remark was proper.

*C. Misstating Evidence*

Pate argues that the prosecutor committed misconduct when she incorrectly stated that a witness testified that the killer was wearing a blue durag and blue shorts when the witness actually testified that the shorts were either black or blue and that the durag was black.

A prosecutor's conduct is improper where they "mislead the jury by misstating the evidence." *State v. Guizzotti*, 60 Wn. App. 289, 296, 803 P.2d 808 (1991). Pate relies on *State v. Markovich*, 19 Wn. App. 2d 157, 170, 492 P.3d 206 (2021), for the contention that "[i]t is serious

misconduct for the public prosecutor to deliberately mislead jurors about the evidence by stating 'facts' not supported in the record." Br. of Appellant at 30-31. In *Markovich*, the court held that the prosecutor did not commit misconduct when it argued, without testimony, that the defendant went looking for drug buyers. 19 Wn. App. 2d at 171. The court reasoned that the challenged statements were not

> flagrant mischaracterizations of the evidence . . . . Given the considerable latitude afforded advocates to draw and argue inferences from the evidence, we cannot say that the arguments were entirely unsupported by the testimony. While the prosecutor may have inaccurately characterized his argument as restatement of the testimony rather than an inference from the evidence presented, the court's timely reminder that counsel's arguments were not evidence served to correct this misstep.

*Id.* at 171-72.

> Here, the prosecutor argued

> For that to be true, to take that argument to its logical conclusion, you also have to find there must also have been a real killer in that area in that time in that space on that date who was a [B]lack male in his 20s, who also happened to be wearing a blue durag, who also happened to be wearing a black tank top, who also happened to be wearing a blue basketball shorts with design along the seams.

>      And the reason I say this is because Gena Colleran and Frank Brogan, the description they gave to the police -- Ms. Colleran, she couldn't even remember what she told the police, but the description that she gave to the police when she was interviewed on that day, the day of the incident when her memory was most fresh, that's the description that she gave. The killer wearing a blue durag, a black tank top, a blue basketball shorts.

11 VRP at 1447-48. Sergeant Nasworthy testified that in Colleran's report, she described the shooter as " 'a [B]lack male in his 20s wearing a dark blue or black long basketball-style shorts, dark shoes, [black tank] top with a black durag on his head.' " 6 VRP at 668.

Both before and shortly after this comment by the prosecutor, the trial court emphasized that "this is argument. And the evidence is the evidence that was presented to you in the courtroom

and the law is in my instructions. This is argument as is instructed in the jury instructions." 11 VRP at 1450, *see id.* at 1398.

As in *Markovich*, the prosecutor's summarization of Colleran's description of the shooter was not entirely unsupported by the testimony. Colleran did describe the shorts as being either blue or black and she did describe the shooter as wearing a durag. Moreover, the court timely and repeatedly reminded the jury that counsel's arguments were not evidence. Accordingly, no prejudice resulted from any misstep that occurred.

*D. Vouching*

Pate argues that the prosecutor committed misconduct by vouching for the credibility of the State's witnesses when she argued that, while discussing the case in the hallway, the witnesses did not say " 'Hey, what are you going to say? I said he had on a black T- shirt.' " Br. of Appellant at 32 (emphasis omitted) (quoting VRP at 1459). This comment was made in response to Pate's argument that the witnesses were not credible because they discussed the case with each other prior to testifying.

"Improper vouching occurs where the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." *Thorgerson*, 172 Wn.2d at 443. That is not what occurred here. The prosecutor did not rely on information that was not presented to the jury. Instead, she explained an inference that she asked the jury to draw as to why they should believe the States' witnesses, despite their brief conversation with each other about the case. "[P]rosecutors have wide latitude to argue reasonable inferences from the facts concerning witness credibility." *State v. Allen*, 176 Wn.2d 611, 631, 294 P.3d 679 (2013) (plurality opinion). Under these circumstances, the prosecutor's comments were not

improper. And as the State noted, if the witnesses had made an effort to coordinate their testimony, the effort was wholly unsuccessful. The witnesses gave inconsistent accounts to the jury related to their description of the suspect. Even if misconduct occurred, there is not a substantial likelihood that the misconduct affected the verdict.

## II. MANDATORY LIFE WITHOUT PAROLE SENTENCE

Pate argues that the trial court erred by concluding that *Monshcke* did not apply because Pate was 22 years old at the time of the offense. Pate contends that *Monschke*'s holding was not limited to defendants age 18-20 years old. But our supreme court has explicitly limited *Monschke* discretion to cases where the defendant is twenty years old or younger. *In re Pers. Restraint of Davis*, 200 Wn.2d 75, 84, 514 P.3d 653 (2022) (denying relief because "Davis was outside the age range of the petitioners who received relief in *Monschke*."); *State v. Carter*, 3 Wn.3d 198, 219, 548 P.3d 935 (2024) ("In *Monschke*, we found *mandatory* [life without parole] unconstitutional as applied to a subset of 18- to 20-year-old defendants."). The trial court did not err by following this binding precedent.

## CONCLUSION

We conclude that the prosecutor did not commit misconduct because her arguments were proper. And we conclude that the trial court did not err by concluding that *Monshcke* did not apply to Pate because he was 22 years old at the time of the offense. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

No. 60300-4-II

_____
CRUSER, J.

We concur:

_____
GLASGOW, J.

_____
PRICE, A.C.J.